STATE OF NORTH CAROLINA v. RONALD WAYNE FRYE

No. 511A93

(Filed 8 September 1995)

**1. Criminal Law §§ 396, 738 (NCI4th)— preliminary instructions—jury as collaborators in judgment—no expression of opinion**

The trial court did not express an opinion by stating to all prospective jurors, "You will become in effect officers of the Court and collaborators in judgment with me," where the statement occurred during the court's preliminary instructions regarding the role of jurors in the criminal justice system, and the court's comments as a whole accurately described the criminal justice process, including the interrelated roles of judge and jury.

**Am Jur 2d, Trial § 277.**

**2. Criminal Law § 395 (NCI4th); Jury § 134 (NCI4th)— court's question to jurors—proof beyond reasonable doubt—no expression of opinion**

The trial court's question to each prospective juror in a capital trial, "If chosen to sit as a juror will you require the state to satisfy you of the defendant's guilt beyond a reasonable doubt before you find him guilty?" did not constitute an expression of opinion that each juror would vote to convict but was a proper attempt to ascertain whether the prospective jurors could follow the court's preliminary instructions regarding the burden of proof.

**Am Jur 2d, Jury § 206.**

**3. Jury § 153 (NCI4th)— capital trial—jury selection—question by court—effect of death penalty views**

The trial court's question to prospective jurors in a capital trial, "If you serve as a juror in this case, and the state has satisfied you of the existence of those things [which constitute first-

degree murder] beyond a reasonable doubt, will you vote to find defendant guilty of first degree murder or would your personal convictions about the death penalty prevent or substantially impair the performance of your duty in accordance with your instructions and your oath?" did not require each juror to draw a legal conclusion about his or her competence to serve or attempt to stake out jurors by eliciting an agreement to vote in favor of a guilty verdict; rather, the question properly sought to assort those prospective jurors who were unable to find defendant guilty, regardless of the evidence presented by the State, because of their views about capital punishment.

**Am Jur 2d, Jury §§ 199, 206, 279.**

**Propriety and effect of asking prospective jurors hypothetical questions, on voir dire, as to how they would decide issues of case. 99 ALR2d 7.**

**Comment Note.—Beliefs regarding capital punishment as disqualifying juror in capital case—post-*Witherspoon* cases. 39 ALR3d 550.**

4. **Criminal Law §§ 396, 1323 (NCI4th)— capital trial— instruction about sentencing hearing—aggravating circumstances—no expression of opinion**

The trial court's instruction that, if defendant is found guilty of first-degree murder, the court will conduct a sentencing hearing at which "the same jury will hear the evidence from the state of aggravating factors . . . [a]nd then the defense may present evidence of mitigating factors" did not improperly imply that the existence of aggravating circumstances was predetermined but that there might be no mitigating circumstances since no capital sentencing proceeding occurs unless the State has evidence to support at least one aggravating circumstance; after such evidence is presented, a defendant is permitted to present evidence of mitigating circumstances but may opt not to present evidence at the sentencing phase; and the instruction was thus accurate and proper.

**Am Jur 2d, Trial § 1444.**

5. **Jury § 187 (NCI4th)— granting of challenge for cause— standard of appellate review**

The granting of a challenge for cause where the juror's fitness or unfitness is arguable is a matter within the sound discretion of

the trial court and will not be disturbed absent a showing of abuse of discretion. The standard of review does not become *de novo* because fundamental constitutional rights are implicated.

**Am Jur 2d, Jury §§ 231, 232.**

6. **Jury § 227 (NCI4th)— capital trial—jury selection—death penalty views—excusal for cause despite rehabilitation**

The trial court did not abuse its discretion by excusing for cause in a capital trial a prospective juror who twice stated in response to questions by the prosecutor that having to vote on the death penalty would substantially impair her ability to function as a juror, and who also stated in response to questioning by the court that her personal convictions would prevent her from recommending the death penalty, even though the juror stated in response to questioning by defense counsel that she could follow the law if selected, since the trial court could have formed a definite impression that the juror would be unable to faithfully and impartially apply the law.

**Am Jur 2d, Jury § 279.**

**Comment Note.—Beliefs regarding capital punishment as disqualifying juror in capital case—post-*Witherspoon* cases. 39 ALR3d 550.**

7. **Criminal Law § 452 (NCI4th)— prosecutor's statements— purpose of aggravating and mitigating circumstances—substantiality of aggravating circumstances—no gross impropriety**

The prosecutor's statements to the effect that aggravating circumstances made a crime deserving of the death penalty and that mitigating circumstances "move[d] it down from death to life," and his statements informing certain panels of prospective jurors that they had to decide in the fourth issue whether the aggravating circumstances were sufficiently substantial to call for a death sentence were essentially correct, did not distort the jury's understanding of mitigating circumstances, and did not require the trial court to intervene *ex mero motu*.

**Am Jur 2d, Trial §§ 554, 555, 566.**

8. **Criminal Law § 452 (NCI4th)— capital sentencing—prosecutor's closing argument—Issue Three—improper burden on defendant—instructions by court—no gross impropriety**

Assuming *arguendo* that the prosecutor's closing argument regarding Issue Three in a capital sentencing proceeding, whether the mitigating circumstances found are insufficient to outweigh the aggravating circumstances found, placed a burden of proof upon defendant which the law does not require, the trial court did not err by failing to intervene immediately to correct the prosecutor where the court notified the jury prior to closing arguments that it would give instructions on the applicable law, instructed the jury that the closing arguments are not evidence, and properly instructed on Issue Three after the closing arguments.

**Am Jur 2d, Trial § 544.**

9. **Indigent Persons § 26 (NCI4th); Constitutional Law § 266 (NCI4th)— capital trial—jury selection—objections by only one attorney—right to additional counsel not violated**

The trial court's ruling that only one attorney from each side could make objections during *voir dire* of prospective jurors did not violate the indigent defendant's statutory right to the assistance of two attorneys in a capital trial since the second attorney remained present and could prompt the first when he thought objections should be made. Nor did this ruling violate defendant's constitutional right to the assistance of counsel because an indigent defendant's right to the appointment of additional counsel in a capital case is statutory, not constitutional. N.C.G.S. § 7A-450(b1); U.S. Const. amend. VI; N.C. Const. art. I, § 23.

**Am Jur 2d, Criminal Law § 976.**

**Comment Note.—Constitutionally protected right of indigent accused to appointment of counsel in state court prosecution. 93 ALR2d 747.**

10. **Jury § 202 (NCI4th)— jury selection—preconceived opinion—excusal for cause—discussions with other jurors—questioning by defendant not allowed**

The trial court did not err by excusing for cause a prospective juror who stated during *voir dire* that he had discussed this murder case with a close friend who knew the victim's brother and had formed an opinion about the case that he would be unable to

set aside without giving defendant a chance to question the juror to determine whether he had discussed his knowledge of and opinions about the case with other prospective jurors where no prospective juror indicated that the excused juror had shared his opinion about the case with other members of the venire; even after the excused juror's departure, defense counsel did not ask any prospective jurors whether the excused juror had divulged to them his opinion or other information about the case; and whether the excused juror talked to other prospective jurors about his opinion is thus a matter of speculation.

**Am Jur 2d, Jury §§ 253, 291, 303.**

**11. Jury § 102 (NCI4th)— newspaper article in jury assembly room—excusal of selected jurors—failure to question remaining prospective jurors**

The trial court did not abuse its discretion by failing to question the remaining prospective jurors *ex mero motu* regarding their exposure to media coverage after it learned that a newspaper article about the case had been circulated around the jury assembly room where the court properly questioned the selected jurors about their exposure to news coverage of this case and the impact such exposure might have on their ability to be fair and impartial; the trial court excused for cause two previously selected jurors who stated they had read the article about the case and were not sure they could set aside that information; defendant objected when the prosecutor challenged these two selected jurors for cause; although defendant was on notice that at least one newspaper had circulated in the jury assembly room, he failed to ask the remaining prospective jurors about their exposure to this article after the two jurors were excused; and defendant accepted a prospective juror who stated that she had read an article about the case at her grandmother's house without asking her whether that article had affected her ability to be fair and impartial.

**Am Jur 2d, Jury § 289.**

**12. Appeal and Error § 155 (NCI4th)— objection to evidence— additional grounds not presented for appeal—waiver**

Where defendant objected to evidence on only one ground, he failed to preserve for review the additional grounds presented on appeal, N.C. R. App. P. 10(b)(1); he also waived appellate review

of those additional arguments by failing specifically and distinctly to argue plain error. N.C. R. App. P. 10(c)(4).

**Am Jur 2d, Appellate Review § 388.**

**13. Evidence and Witnesses § 1457 (NCI4th)— blood sample— chain of custody—who took sample**

The first link in the chain of custody of a blood sample, that is, who drew the blood, was sufficiently proven to permit admission of the sample and expert testimony based thereon where the autopsy physician testified that an autopsy assistant was also present during the autopsy; an investigator testified that he received two vials of the victim's blood directly from the autopsy physician and the autopsy assistant; and this evidence permits an inference that either the physician or the assistant drew the blood during the autopsy.

**Am Jur 2d, Evidence §§ 946, 947.**

**14. Criminal Law § 463 (NCI4th)— prosecutors' closing arguments—scenarios supported by evidence**

The prosecutors' closing arguments in this murder trial suggesting that defendant stabbed the victim several times to force him to reveal the location of his money but not to kill him, that the victim revealed his money was under the mattress, and that defendant wiped the victim's blood from his hands with a pair of pants, obtained the money, washed his hands, and then stabbed the victim to death was supported by evidence that the fatal wound was the one in the center of the victim's chest from which a pair of scissors was removed; the remaining wounds to the chest and neck were painful but not fatal and were inflicted prior to the victim's death; the mattress in the victim's bedroom was found askew and contained blood consistent with defendant's; . blood consistent with that of the victim was found on a pair of pants in the bedroom; and police officers found blood around the kitchen sink and on the faucet handles.

**Am Jur 2d, Trial §§ 554, 566, 632.**

**15. Criminal Law § 460 (NCI4th)— capital sentencing—closing argument—thoughts of victim during murder—permissible inferences from evidence**

The prosecutor's argument in a capital sentencing proceeding that the murder was especially heinous, atrocious, or cruel by

surmising that the victim may have been thinking that he had treated defendant like a son and was wondering why defendant was doing this to him was not so grossly improper as to require the trial court to intervene *ex mero motu* where there was evidence that defendant considered the victim a friend and appeared to view him as a father figure, that the victim forgave defendant's debts in exchange for work around the house and yard, and that the relationship between the two was one of trust and kindness.

**Am Jur 2d, Trial § 632.**

### 16. Criminal Law § 450 (NCI4th)— closing argument—references to victim's wounds—no gross impropriety

The prosecutor's references to the victim's wounds as "slashes" and "stabs" when some were only minor lacerations were neither inflammatory nor grossly improper.

**Am Jur 2d, Trial §§ 664, 665.**

### 17. Homicide § 253 (NCI4th)— first-degree murder—sufficient evidence of premeditation and deliberation

Even if the evidence shows that defendant entered the victim's home with the intent to rob and not to kill, the trial court properly submitted to the jury the charge of first-degree murder based on premeditation and deliberation where the evidence showed that the victim was felled in his living room near the front door; there was no evidence that the victim provoked defendant into stabbing him; the evidence permits the inferences that defendant struck the deadly blow after felling the victim and rendering him defenseless and that he used a second deadly weapon, scissors, after the first one, a knife, broke from the force of his attack; and the evidence tends to show that defendant killed the victim to avoid apprehension.

**Am Jur 2d, Homicide § 439.**

**Homicide: presumption of deliberation or premeditation from the fact of killing. 86 ALR2d 656.**

**Homicide: presumption of deliberation or premeditation from the circumstances attending the killing. 96 ALR2d 1435.**

**Modern status of the rules requiring malice "aforethought," "deliberation," or "premeditation," as elements of murder in the first degree. 18 ALR4th 961.**

**18. Homicide § 552 (NCI4th)— first-degree murder trial— instruction on second-degree murder not required**

The evidence in a first-degree murder prosecution did not require the trial court to submit second-degree murder to the jury where uncontroverted evidence supported an inference of premeditation and deliberation. Defendant's assertion that he had the intent only to rob when he arrived at the victim's house does not negate or contradict the State's proof of premeditation and deliberation, and an investigator's testimony that he had the impression that a struggle had occurred at the victim's house, without more, was insufficient to require a second-degree murder instruction.

**Am Jur 2d, Homicide §§ 501, 511.**

**19. Criminal Law § 1344 (NCI4th)— capital trial—especially heinous, atrocious, or cruel aggravating circumstance— psychological torture**

The evidence in a capital trial permitted the inference that the murder involved psychological torture sufficient to support submission of the especially heinous, atrocious, or cruel aggravating circumstance where it tended to show that the victim, defendant's landlord, had forgiven defendant's rent payments in exchange for yard work; defendant viewed the victim as a benign father figure, indicating that the men trusted and were kind to each other; five wounds were inflicted to the victim's neck and chest before the sixth and fatal stab wound; the fatal stab wound, which tore a hole in the victim's aorta, caused him to bleed to death; the victim would not have lost consciousness immediately but would have remained conscious for about two minutes; defendant first used a sharp knife but resorted to scissors when the knife blade broke off of the handle; the victim was still alive while defendant searched his bedroom for money; blood evidence raised an inference that defendant cut the victim and left him to bleed and feel pain but not to die before he ransacked the bedroom; and defendant inflicted the fatal blow before leaving the house because he knew the victim could identify him. N.C.G.S. § 15A-2000(e)(9).

**Am Jur 2d, Criminal Law §§ 598, 599.**

**20. Criminal Law § 1355 (NCI4th)— capital sentencing—mitigating circumstance—no significant criminal history—supporting evidence**

The evidence was sufficient to support submission of the mitigating circumstance that defendant had no significant history of prior criminal activity where evidence of defendant's criminal past consisted of testimony about his extensive use of illicit drugs and testimony by a county jailer that he had "dealt with [defendant] a number of times over the years" when defendant was "in jail for reasons," defendant requested that the court submit this circumstance, and the trial court could have viewed evidence presented by defendant about his drug use and prior periods of incarceration as offered to support this circumstance. Further, the trial court properly allowed the State to present evidence of defendant's criminal record in rebuttal. N.C.G.S. § 15A-2000(f)(1).

**Am Jur 2d, Criminal Law §§ 598, 599.**

**21. Criminal Law § 1363 (NCI4th)— alcohol intoxication—nonstatutory mitigating circumstance—refusal to submit—subsumption in impaired capacity circumstance**

The trial court did not err by refusing to submit the nonstatutory mitigating circumstance that defendant's alcohol intoxication impaired his abilities to conform his behavior to the requirements of the law since it was subsumed within the submitted and found statutory mitigating circumstance that the capacity of defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired, N.C.G.S. § 15A-2000(f)(6). Further, the court instructed on three nonstatutory circumstances regarding defendant's alcohol problem, the circumstance that defendant had a diminished capacity to conform his social behavior to social norms, and the "catchall" circumstance, and the jury was thus not precluded from considering mitigating evidence regarding defendant's alcohol abuse and its effect on his mental capacity.

**Am Jur 2d, Criminal Law §§ 598, 599.**

**22. Criminal Law § 454 (NCI4th)— capital sentencing—prosecutors' closing arguments—reminder to follow the law—no gross impropriety**

Closing arguments by the prosecutors in a capital sentencing proceeding to the effect that the jury should be guided by the law,

not by emotions, and that all persons are treated alike by the law did not misstate the law and were not grossly improper. Further, prosecutors could properly argue to the sentencing jury that its decision should be based not on sympathy, mercy, or whether it wants to kill the defendant, but on the law.

**Am Jur 2d, Trial §§ 554, 555, 566.**

**23. Criminal Law § 454 (NCI4th)— capital sentencing—prosecutors' closing arguments—telling jury to follow the law—no diminishment of jury's responsibility**

The closing arguments of the prosecutors in a capital sentencing proceeding did not diminish the jury's sense of responsibility by telling the jury to follow the law since juries are to exercise guided discretion when making the findings required by the capital sentencing statute, and the law, as instructed by the court, constitutes the jury's guide in exercising its discretion.

**Am Jur 2d, Trial §§ 497, 566-568, 572.**

**24. Criminal Law § 452 (NCI4th)— capital sentencing—closing argument—comment about mitigating circumstances**

The prosecutor did not improperly criticize the capital sentencing statute or disparage defendant's right to present evidence in mitigation by arguing that the State is restricted in the presentation of aggravating circumstances while the defense can "play a numbers game" and "come up with as many [mitigating circumstances] as [it] want[s]" where the comment, read in context, was intended to attack the weight of mitigating circumstances and to convince the jury that the fifty-nine mitigating circumstances could not outweigh the two aggravating circumstances.

**Am Jur 2d, Trial § 572.**

**25. Criminal Law § 433 (NCI4th)— capital sentencing—closing argument—dangerousness of defendant—supporting evidence**

The prosecutor's argument that defendant was a Type H inmate, "the most dangerous there are" was a reasonable extrapolation from a psychologist's testimony that Type H inmates, such as defendant, "are some of the most disturbed inmates," are more likely to be psychotic, and "typically have been hard drug users before they went to jail."

**Am Jur 2d, Trial § 614.**

**26. Criminal Law § 1357 (NCI4th)— capital sentencing—mental or emotional disturbance mitigating circumstance—instruction using conjunctive—no plain error**

The trial court's instruction that the jury should find the mental or emotional disturbance mitigating circumstance, N.C.G.S. § 15A-2000(f)(2), if it determined that defendant was under the influence of a mental and/or emotional disturbance at the time of the murder as a result of "paranoid disorder, mixed substance abuse disorder, mixed personality disorder, and child abuse syndrome" did not constitute plain error because of the court's use of the conjunctive where the court also stated that "it is enough that the defendant's mind or emotions were disturbed from any cause," since this permitted the jury to consider any or all of defendant's psychological problems in the context of that circumstance.

**Am Jur 2d, Criminal Law §§ 598, 599.**

**27. Criminal Law § 1360 (NCI4th)— capital sentencing—impaired capacity mitigating circumstance—instruction using conjunctive—no plain error**

The trial court's instruction that the jury should find the impaired capacity mitigating circumstance, N.C.G.S. § 15A-2000(f)(6), if it found "that the defendant suffered from paranoid disorder, mixed substance abuse disorder, mixed personality disorder and substance abuse syndrome, and that this impaired his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law" did not constitute plain error because of the court's use of the conjunctive where defendant's psychologist never testified that any one of defendant's disorders alone resulted in impaired capacity; the psychologist did testify that defendant's history of drug abuse exacerbated his paranoia and that "intoxicants *and* psychosis [were] driving his behavior" at the time of the crime; and the instruction thus basically comported with defendant's evidence.

**Am Jur 2d, Criminal Law §§ 598, 599.**

**28. Criminal Law § 1361 (NCI4th)— capital sentencing—impaired capacity mitigating circumstance—instructions—omission of intoxication**

The trial court did not err by omitting intoxication as a factor from its instruction on impaired capacity where the evidence

showed only that defendant smoked crack cocaine on the Friday night preceding the Sunday morning murder and that he walked unsteadily on the Saturday night before the murder, but there was no evidence that defendant was intoxicated at the time of the murder.

**Am Jur 2d, Criminal Law §§ 598, 599.**

29. **Criminal Law § 1360 (NCI4th)— capital sentencing— impaired capacity mitigating circumstance—instructions— omission of child abuse syndrome—harmless error**

Assuming *arguendo* that the trial court erred by failing to include child abuse syndrome in its instruction on the impaired capacity mitigating circumstance, this error did not improperly restrict the jury's consideration of mitigating evidence and was harmless beyond a reasonable doubt where the jury heard testimony from defendant's psychologist about the physical abuse defendant endured in a foster home and his opinion that defendant suffered from child abuse syndrome, and the trial court submitted the "catchall" mitigating circumstance, which no juror found.

**Am Jur 2d, Criminal Law §§ 598, 599.**

30. **Criminal Law § 1323 (NCI4th)— capital sentencing—nonstatutory mitigating circumstances—failure to instruct on each circumstance submitted—harmless error**

Any error in the trial court's failure to give an individual instruction for each of the fifty-four nonstatutory mitigating circumstances submitted on the mechanics by which the jury might answer "yes" to such a circumstance was harmless where the jury heard and was instructed to consider all the evidence defendant proffered in mitigation; all fifty-four nonstatutory mitigating circumstances were listed individually on the Issues and Recommendation as to Punishment form; the jury found thirty-two of them and also found two statutory mitigating circumstances; the trial court submitted, but the jury did not find, the "catchall" circumstance; and despite the substantial amount of mitigating evidence, the jury recommended a sentence of death.

**Am Jur 2d, Trial § 1125.**

STATE v. FRYE

[341 N.C. 470 (1995)]

### 31. Criminal Law § 1373 (NCI4th)— death penalty not disproportionate

A sentence of death imposed upon defendant for first-degree murder was not excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant, where defendant stabbed the victim to death in his own home during a nighttime robbery; the jury convicted defendant under both the felony murder rule and the theory of malice, premeditation and deliberation; defendant chose to kill a person who had treated him with kindness and compassion and who was viewed by defendant as a friend and father figure; the victim suffered physical and psychological torture in that he was not only in pain but was also aware of his impending death as he lay bleeding on his living room floor; and the victim, age seventy, would have been unequal in physical strength to defendant, a healthy thirty-four-year-old man. Defendant's sentence was not disproportionate because the jury found numerous mitigating circumstances and only two aggravating circumstances.

**Am Jur 2d, Criminal Law § 628.**

Appeal of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Hyatt, J., at the 1 November 1993 Criminal Session of Superior Court, Catawba County, on a jury verdict finding defendant guilty of first-degree murder and robbery with a dangerous weapon. Heard in the Supreme Court 10 May 1995.

*Michael F. Easley, Attorney General, by William P. Hart, Special Deputy Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Constance H. Everhart, Assistant Appellate Defender, for defendant-appellant.*

WHICHARD, Justice.

Defendant was tried capitally for the first-degree murder and robbery with a dangerous weapon of Ralph Childress, his landlord. The jury found defendant guilty of all charges and recommended a sentence of death for the first-degree murder. The trial court sentenced accordingly on the murder charge. It arrested judgment on the robbery conviction because it was the basis for an aggravating circumstance found by the jury in the capital case. We hold that defendant

had a fair trial, free of prejudicial error, and that the sentence of death is not disproportionate.

The State's guilt-phase evidence tended to show the following:

Leroy Childress, the victim's brother, testified that the victim owned a trailer, across the street from his home, which he had leased to defendant for about a year prior to his death. Defendant could not always pay the rent, so the victim occasionally allowed him to perform yard work in exchange for the rent owed. The victim had been trying to evict defendant for two or three months before the murder, but defendant had not left. Leroy and the victim spent the afternoon together on Saturday, 23 January 1993. At 6:00 p.m. they arrived at the victim's home where the victim wrote and signed two notes, which Leroy also signed, ordering defendant to vacate the trailer. Leroy affixed one note to the front door of the trailer and the other to the back door. The brothers then drove to Leroy's house to retrieve the victim's truck. The victim drove off to run an errand; Leroy never again saw him alive. Leroy further testified that the victim was known to carry five thousand dollars in his pocket in a roll consisting primarily of hundred-dollar bills.

The victim telephoned Leroy at about 2:00 a.m. on Sunday, 24 January. He stated that defendant, who had been at his house trying to sell him a couch, would vacate the trailer in the morning. According to Leroy, the victim called because he was upset about defendant's visit. At the close of the conversation, Leroy told the victim he would see him at breakfast later that morning.

Leroy telephoned the victim about one-half hour before he planned to pick him up for breakfast. The victim did not answer; Leroy immediately rushed to his house, arriving between 7:30 and 8:00 a.m. He found the storm door open and the victim lying on the floor near the door with a pair of scissors embedded in his chest. The telephone had been disconnected, so Leroy called the police from a neighbor's house.

Hickory police officers arrived at about 8:01 a.m. They found the victim with the scissors in his chest and blood around his neck area. A bloody wallet, devoid of money, lay open between his legs. The investigation of the premises revealed no sign of forced entry.

The living room furniture had been knocked over. Police found a .38 Special revolver under a cushion behind a footstool and a bloody knife blade under the cushion of an easy chair. A small file box next

to the chair appeared to have been opened; police removed a latent fingerprint from the box. The television was still on.

The light in the victim's bedroom was on, the bed covers were pulled back revealing a blood smear on the mattress, and the cord to the telephone on the nightstand had been pulled out of the wall. Desk drawers were open, and clothes were scattered about the room. A knife handle was discovered on the floor near the bedroom door. Just inside the door, police found a pair of bloodstained khaki pants. In the kitchen bloodstains were found around the sink area, including the faucet handles. A silver Derringer .22-caliber pistol lay on the kitchen table with blood on its handle.

Leroy testified that the .38 Special belonged to the victim and was normally kept under the cushion of the footstool in front of the easy chair. He never kept the gun loaded; he stored the cartridges in the nightstand beside the chair. The victim also owned the Derringer and ordinarily kept it in his top dresser drawer.

Leroy and his daughter, Linda Cline, returned to the victim's house to clean it on 30 January 1993. Cline found a piece of white paper with duct tape on it in the bedroom. It said, "Get out now," in Leroy's handwriting and bore his signature. Leroy identified the paper as one of the two notes he had attached to defendant's trailer and turned it over to police on 2 February 1993.

Dr. Joseph Vogel testified about the autopsy results. The victim's body contained six discrete wounds to the neck and chest region. Dr. Vogel determined that blood loss from the stab wound to the chest from which the scissors were removed caused the victim's death. That wound penetrated through the skin and sternum into the aorta. The victim bled one and one-half liters of blood into his left chest cavity and one liter into the right. The other chest wounds were inflicted prior to death by a relatively dull instrument, such as scissors. They would have caused pain but not unconsciousness. Bruising occurred around the chest wounds, and three ribs were broken.

The victim also sustained two neck wounds which could have been inflicted by a knife blade or sharp scissors. One was almost one and one-half inches deep and cut into smaller blood vessels and some neck muscles. The other, one-half inch wide, penetrated to the bone under the chin. These wounds could have been inflicted sometime before the fatal chest wound and occurred prior to the victim's death.

Nothing indicated that the victim would have lost consciousness prior to his death.

Michael Ramseur testified that defendant bought seventy-five dollars' worth of crack from him late on a Friday night in January 1993. After he had smoked it, he traded jewelry, old coins, and a microwave for more crack. He returned to Ramseur on Saturday morning, out of money. He told Ramseur he knew he could get some money from "that landlord." Defendant suggested that Ramseur rob the man, who would recognize defendant if he did it, but Ramseur refused. Defendant then told Ramseur to meet him at 11:30 on Sunday morning; he would have money with which to buy more crack. On Sunday, Ramseur saw defendant and sold him more drugs. At that time defendant had a roll of money which included five or six hundred-dollar bills.

Kenneth Berry, defendant's cousin, testified that he lived next door to the victim. He further testified that defendant came to his house between 11:30 p.m. on 23 January and 1:00 a.m. on 24 January. Defendant was drunk and tried to sell the green army jacket he was wearing and two tires to Berry. Berry told defendant not to sell his jacket and sent him away; defendant did not have a cut on his hand at that time.

Doug Propst testified that defendant visited him between 8:30 and 9:00 on 24 January and paid him the one hundred dollars he owed. The two men smoked some crack; defendant then laid a large number of hundred-dollar bills on the counter, stating it totaled three thousand dollars. Propst asked defendant where he had obtained the money, and defendant replied, "Ask me no questions, I'll tell you no lies." Defendant stayed with Propst until Tuesday, when he was arrested. Police officers conducted a consent search of Propst's house. They seized the army jacket defendant was wearing when he arrived on 24 January, among other items.

Franki Bryson testified that she saw defendant on a Sunday morning in 1993 and that they were both smoking crack. Defendant, who then had a lot of hundred-dollar bills, asked her to buy some crack for him. She did so and continued to buy drugs for him with his money, two or three hundred dollars at a time, from Sunday until the time of his arrest. When Bryson first saw defendant on Sunday, his hand was cut. Defendant kept all his money in a roll.

Kevin Templeton testified that he had used drugs with defendant in the past. He knew the victim and had spoken with defendant several times after the murder. Templeton told defendant that he had heard that defendant had a lot of money, and he asked why he had no more left. Defendant replied that he had spent some on drugs and given some to a girl. He also told Templeton he "only meant it to be a robbery" and "got carried away." Defendant said he had obtained almost five thousand dollars.

SBI Special Agent Jennifer Elwell of the Serology Section testified about the blood she found on various pieces of evidence. She determined that: blood on the knife handle, Derringer, mattress, three areas of defendant's army jacket, and defendant's blue jeans was consistent with that of defendant; blood on the khaki pants, knife blade, and the left sleeve of defendant's army jacket was consistent with that of the victim.

SBI Special Agent Mark Boodee analyzed the DNA content of substances on several items of evidence received from Elwell. He determined that bloodstains from the knife blade and the army jacket matched the blood sample taken from the victim. He further determined that the bloodstain from the mattress matched the sample taken from defendant.

Defendant presented no evidence during the guilt phase. The State introduced no additional evidence at the sentencing phase.

Defendant's sentencing phase evidence showed the following:

Paul Burgess, the chief jailer at the Catawba County Jail, testified that defendant had caused no problems while incarcerated for nine months awaiting trial. Further, defendant had been in jail previously and had demonstrated an ability to conform to prison life.

Dr. Jerry Noble, a clinical psychologist, testified about his interviews with defendant and the results of psychological tests he administered. Defendant did not talk about the victim's death and never directly expressed feelings of remorse for the murder. He did speak well of the victim, whom he considered a friend. Defendant requested that Dr. Noble not talk with his family; the doctor spoke only with defendant and defense counsel. Defendant had lived in several foster homes and an orphanage. He suffered extreme physical abuse at the hands of his first foster father. He dropped out of high school and began abusing drugs and alcohol as a teenager. Dr. Noble opined that the victim represented a benign father figure to defendant.

**STATE v. FRYE**

[341 N.C. 470 (1995)]

Test results revealed that defendant was immature, suspicious, isolated, oriented toward immediate gratification, and had difficulty sustaining interpersonal relationships. He also had concerns about being conspired against and persecuted. Dr. Noble diagnosed defendant with three psychiatric disorders: paranoia; mixed substance abuse; and mixed personality. He also believed defendant suffered from child abuse syndrome. Dr. Noble opined that defendant had diminished capacity to know right from wrong and to conform his behavior to social requirements.

On rebuttal the State presented evidence of defendant's criminal record, which included convictions for damage to property, damage to city property, assault on an officer, destruction of property, felonious breaking and entering, and possession with intent to sell or deliver drugs.

JURY SELECTION

Defendant first assigns as error four statements made by the trial court to all prospective jurors. He argues that the comments indicated the court's opinion about the proper verdict or otherwise gave weight to the State's position.

[1] First, defendant contends the court encouraged the jurors to identify with it by stating, "You will become in effect officers of the Court and collaborators in judgment with me." He asserts this comment ensured that any suggestion of an opinion by the court would carry significant weight with the jury and would affect the verdict. We disagree. The statement occurred during the court's preliminary instructions, before the prospective jurors were sworn, regarding their role in the criminal justice system. The court stated, *inter alia*:

> When you are selected and qualify as jurors in a trial, and [take] the juror[']s oath, you become the sole judges of the weight to be given any evidence and the credibility of each and every witness. Any decision agreed to by all 12 jurors which is free of partiality, unbiased and unprejudiced, reached in sound and conscientious judgment based on credible evidence, and in accord with the Court's instruction, becomes a final and determinative result in a case. You will become in effect officers of the Court and collaborators in judgment with me.
>
> It is my duty to see that the trial is conducted in accord with the rules of law that prescribe the pattern of trial procedure, to rule on points of evidence, to maintain order, to preserve deco-

rum, and instruct you on that law that you are to apply to the facts as you find the facts to be.

. . . .

Your entry upon this service will delegate to you certain powers of decision on human affairs which are not given to every citizen. It will impose upon you important duties and grave responsibilities which enlist your best talent of appraisal and judgment to discharge.

These comments accurately described the criminal justice process, including the interrelated roles of judge and jury. We cannot conclude that the statement defendant complains of was erroneous.

[2] Second, the trial court asked each prospective juror: "If chosen to sit as a juror will you require the state to satisfy you of the defendant's guilt beyond a reasonable doubt before you find him guilty?" Defendant contends this question improperly conveyed an assumption that each juror would vote to convict. Defendant further contends the court exacerbated this error by failing to ask whether the prospective juror would vote to acquit if not satisfied of defendant's guilt beyond a reasonable doubt.

N.C.G.S. § 15A-1222 provides that a court "may not express[,] during any stage of the trial, any opinion in the presence of the jury on any question of fact to be decided by the jury." N.C.G.S. § 15A-1222 (1988). The context of the court's comment reveals that it was not an expression of opinion but an attempt to ascertain whether the prospective jurors could follow the court's preliminary instructions regarding the burden of proof. We conclude that no reasonable juror would have interpreted the question as indicating an opinion of the court.

[3] Third, the trial court asked the following question after explaining the two sentences possible for first-degree murder:

If you serve as a juror in this case, and the state has satisfied you of the existence of those things [which constitute first-degree murder] beyond a reasonable doubt, will you vote to find the defendant guilty of first degree murder or would your personal convictions about the death penalty prevent or substantially impair the performance of your duty in accordance with your instructions and your oath?

Defendant asserts that this inquiry was erroneous because, among other reasons, it required each juror to draw a legal conclusion about his or her competence to serve and had the effect of staking out jurors by eliciting an agreement to vote in favor of a guilty verdict. We cannot conclude that this question was improper. It sought to assort those prospective jurors who were unable to find defendant guilty, regardless of the evidence presented by the State, because of their views about capital punishment. Such jurors may be excused for cause. *Wainwright v. Witt*, 469 U.S. 412, 424, 83 L. Ed. 2d 841, 851-52 (1985).

**[4]** Fourth, defendant contends the trial court accorded undue weight to the State's position during its remarks regarding aggravating and mitigating circumstances, in which it stated:

Members of the jury, if the defendant is found guilty of first degree murder, then the court will conduct a sentencing trial. At that trial the same jury will hear the evidence from the state of aggravating factors, those factors which suggest that the death penalty should be imposed. And then the defense may present evidence of mitigating factors, that is, those factors which suggest that life imprisonment should be imposed.

Defendant asserts that this instruction improperly implied that the existence of aggravating circumstances was predetermined but that there might be no mitigating circumstances. We disagree. No capital sentencing proceeding occurs unless the State has evidence to support at least one aggravating circumstance. *State v. Johnson*, 298 N.C. 47, 79-80, 257 S.E.2d 597, 620 (1979). After such evidence is presented, a defendant is permitted to present evidence of mitigating circumstances. *State v. Taylor*, 304 N.C. 249, 276-77, 283 S.E.2d 761, 779 (1981), *cert. denied*, 463 U.S. 1213, 77 L. Ed. 2d 1398, *reh'g denied*, 463 U.S. 1249, 77 L. Ed. 2d 1456 (1983). A defendant may opt not to present any evidence at the sentencing phase. Thus, the instruction was accurate, proper, and not an expression of the court's opinion. These assignments of error are overruled.

Defendant next contends the trial court committed reversible error by striking prospective juror Mallonee for cause. He asserts the court should not have excused her for her views on the death penalty unless they would have prevented or substantially impaired her performance of her duty as a juror. Defendant contends that Mallonee should not have been excused because she affirmatively agreed to follow the law, said she believed in the death penalty, and made state-

ments indicating that although she would not like to impose the death penalty, she could do so.

[5] Defendant asserts that the standard of review is *de novo* because fundamental constitutional rights are implicated. The United States Supreme Court, however, has stated that "deference must be paid to the trial judge who sees and hears the juror." *Wainwright*, 469 U.S. at 426, 83 L. Ed. 2d at 853. Accordingly, "[t]he granting of a challenge for cause where the juror's fitness or unfitness is arguable is a matter within the sound discretion of the trial court and will not be disturbed absent a showing of abuse of discretion." *State v. Abraham*, 338 N.C. 315, 343, 451 S.E.2d 131, 145 (1994).

[6] In response to questioning by the prosecutor during *voir dire*, Mallonee twice stated that having to vote on the death penalty would substantially impair her ability to function as a juror. She also stated, in response to questioning by the court, that her personal convictions would prevent her from recommending the death penalty. These responses appear to contradict her statement to defense counsel that she could follow the law if selected. Defendant contends that because Mallonee's responses to the questions of the court and the prosecutor are consistent with a desire to follow the law, the court should not have excused her for cause.

The bias of a prospective juror may not be provable with unmistakable clarity. *Wainwright*, 469 U.S. at 424, 83 L. Ed. 2d at 852. "Despite [a] lack of clarity in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law." *Id.* The trial court here properly could have formed such an impression about Mallonee. Thus, we conclude that it did not abuse its discretion by excusing this prospective juror for cause. This assignment of error is overruled.

[7] Next, defendant asserts that certain of the prosecutor's comments, during both *voir dire* and closing arguments at sentencing, distorted the jury's understanding of the function of mitigating circumstances. The prosecutor stated, in different forms, that aggravating circumstances made a crime more deserving of the death penalty and that mitigating circumstances, for example, "move[d] it down from death to life." Defendant contends the prosecutor also misstated the fourth issue of the capital sentencing procedure by informing certain panels of prospective jurors that they had to decide whether the aggravating circumstances were sufficiently substantial to call for a

death sentence. This, defendant argues, misrepresented the importance of mitigating evidence by omitting it from the calculus.

At sentencing the prosecutor again stated that a mitigating circumstance reduced the prospect of the death penalty. He also stated, with regard to Issue Three:

> Do you unanimously find beyond a reasonable doubt that mitigating circumstance or circumstances are insufficient to outweigh the aggravating? So let me not confuse you. The first issue, is there any aggravating? I said you find yes. . . . Are any mitigating? You've got 59. So find as many as you want. Three[,] . . . you have to balance them. Number three's your balance question. . . . If some of you found yes on all 59 at this weighing session . . . [e]very one of those will not stack to reach his burden. And outweigh the aggravating circumstances of the State. . . . And I say number three is a yes, those mitigating circumstances don't outweigh what happened [in] this case. So find every one of them yes, if that's what you think, and I argue to you, you can find every one of them yes, that's still going to be a burden they can't overcome.

Defendant argues that this was an insidious misstatement of the law because defendants bear no burden of proof regarding the third issue.

Defendant did not object to any of these statements at trial. Thus, we will find error only if the comments were so grossly improper that the trial court should have intervened *ex mero motu*. "[T]he impropriety of the argument must be gross indeed in order for this Court to hold that a trial [court] abused [its] discretion in not recognizing and correcting *ex mero motu* an argument which defense counsel apparently did not believe was prejudicial when he heard it." *State v. Johnson*, 298 N.C. 355, 369, 259 S.E.2d 752, 761 (1979).

The comments during jury selection were shorthand summaries of the definitions of aggravating and mitigating circumstances. They were substantially correct, even if slightly slanted toward the State's perspective. The statement concerning Issue Four of the balancing process at sentencing was also essentially correct. Further, the prosecutor reminded the prospective jurors that the court would instruct them on the applicable law at the appropriate time, and the court properly did so. The statements were not grossly improper and did not require the trial court to intervene *ex mero motu*.

**[8]** Assuming *arguendo* that the closing argument regarding Issue Three placed a burden of proof upon defendant which the law does not require, we nevertheless conclude the trial court did not err by failing to intervene immediately to correct the prosecutor. Before closing arguments began, the court told the jury: "At the conclusion of these arguments I will instruct you on the law in this case . . . . The final arguments of the lawyers are not evidence but are given to assist you in evaluating the evidence. . . . I will go over [the Issues & Recommendations as to Punishment form] with you during my instructions." Further, the court properly instructed on Issue Three at the close of the arguments. Specifically, the court stated, "If you unanimously find beyond a reasonable doubt that the mitigating circumstances found are insufficient to outweigh the aggravating circumstances found, you would answer issue three yes." This correctly stated the applicable burden of proof. In this context, the prosecutor's statement could not have denied defendant due process of law and was not grossly improper. *See State v. Jones*, 336 N.C. 490, 493-96, 445 S.E.2d 23, 24-26 (1994) (assuming *arguendo* prosecutor erroneously defined "reasonable doubt," defendant not entitled to new trial where court notified jury prior to arguments that it would give instructions on the applicable law and then properly instructed on reasonable doubt after closing arguments). These assignments of error are overruled.

**[9]** Next, defendant asserts that the trial court improperly allowed only one of his attorneys to conduct *voir dire*. During the questioning of a prospective juror by the State, both defense attorneys objected at different times. After an objection by the second attorney, the trial court ruled that it would "hear from one of you and not both and, of course, this applies to [the prosecutors]." Defendant argues that this ruling impermissibly infringed on his statutory right to the assistance of two attorneys in a capital trial and his constitutional right to the assistance of counsel. We disagree.

The governing statute provides in relevant part:

An indigent person indicted for murder may not be tried where the State is seeking the death penalty without an assistant counsel being appointed in a timely manner. If the indigent person is represented by the public defender's office, the requirement of an assistant counsel may be satisfied by the assignment to the case of an additional attorney from the public defender's staff.

N.C.G.S. § 7A-450(b1) (1989). Violation of this statute constitutes prejudicial error *per se*. *State v. Hucks*, 323 N.C. 574, 579-81, 374 S.E.2d 240, 244-45 (1988).

We do not interpret the trial court's ruling to have violated defendant's statutory entitlement to two attorneys, however. The court ruled that only one attorney from each side could make objections during *voir dire*. The second attorney remained present and could prompt the first when he thought objections should be made. The court thus did not deny defendant the assistance of a second attorney or so drastically circumscribe the second attorney's role as to render the appointment of two attorneys meaningless. Therefore, the statute was not violated.

The Sixth Amendment to the United States Constitution and Article I, Section 23 of the North Carolina Constitution secure a defendant's right to the assistance of counsel. *State v. Colbert*, 311 N.C. 283, 286, 316 S.E.2d 79, 80-81 (1984). Defendant contends the trial court's ruling prejudiced these rights. Defendant did not raise this constitutional issue at trial and therefore failed to preserve it for our review. *See State v. Gibbs*, 335 N.C. 1, 42, 436 S.E.2d 321, 344 (1993), *cert. denied,* — U.S. —, 129 L. Ed. 2d 881 (1994). Defendant would not prevail even if he had preserved the issue, however, because "[a]n indigent defendant's right to the appointment of *additional* counsel in capital cases is statutory, not constitutional." *State v. Locklear*, 322 N.C. 349, 357, 368 S.E.2d 377, 382 (1988). These assignments of error are overruled.

[10] Defendant also contends the trial court erred by excusing prospective juror Kenneth Pless, upon the State's challenge for cause, without according defendant a chance to question him. Pless stated during *voir dire* that he had a close friend who knew the victim's brother, that he had discussed the case with his friend, that he had formed an opinion about the case, and that he would be unable to set aside that opinion. After Pless left the courtroom following the court's excusal for cause, defense counsel informed the court that the purpose of his request for further questioning was to determine whether Pless had discussed his knowledge of and opinions about the case with other prospective jurors. Defendant contends the court should have allowed such an inquiry and that its failure to do so constitutes reversible error.

Whether to excuse a prospective juror for cause is a decision within the trial court's sound discretion. *State v. McDowell*, 329 N.C.

363, 379-80, 407 S.E.2d 200, 209 (1991). A defendant must show both an abuse of discretion and prejudice to establish reversible error relating to *voir dire*. *State v. Parks*, 324 N.C. 420, 423, 378 S.E.2d 785, 787 (1989). Defendant has not met this burden. No prospective juror, including Pless, indicated that Pless had shared his opinion about the case with other members of the *venire*. Further, defense counsel did not—even after Pless's departure—ask any prospective jurors whether Pless had divulged to them his opinion or other information regarding the case. Thus, we are left with speculation as to whether Pless talked to other prospective jurors about his opinion. Mere speculation is an insufficient basis upon which to grant relief. *See State v. Bell*, 338 N.C. 363, 379, 450 S.E.2d 710, 719 (1994), *cert. denied*, —— U.S. ——, 132 L. Ed. 2d 861 (1995). This assignment of error is overruled.

[11] Defendant also contends the trial court erred by failing to question prospective jurors *ex mero motu* regarding their exposure to media coverage after it learned that a newspaper article about the case had been circulated around the jury assembly room. Prospective juror Anita Allison testified on *voir dire* that she had read a newspaper article about the jury selection brought into the jury assembly room by another member of the jury pool. At this time, eleven jurors had been selected. Defendant challenged Allison for cause the next morning. The court then questioned the entire panel of twelve, including Allison, about exposure to media coverage. Allison and two others admitted to seeing the article. Maria Sharpe stated that she had read the entire article the morning she was chosen and that something bothered her about the case as a result. Sharpe and Allison were both excused for cause. The third person who admitted seeing the article said that he had read only defendant's name and the charges and that this would not impair his ability to be fair and impartial. He remained on the jury panel. Defendant concedes that the court properly questioned the selected jurors "regarding their exposure to the news coverage of this case and what impact, if any, such exposure might have on their ability to be fair and impartial." He contends, however, that the trial court should have questioned subsequent prospective jurors in a similar manner even though defendant himself neither requested nor conducted such an inquiry.

Defendant has again failed to show that the trial court abused its discretion and that he suffered prejudice as a result. Defendant was on notice that at least one newspaper had circulated in the jury assembly room; he chose, however, not to ask prospective jurors

about their exposure to media coverage after Sharpe and Allison were excused. In fact, defendant objected when the prosecutor challenged for cause two jurors who stated that they had read information about the case and were not sure they could set aside that information. The trial court excused both jurors. Defendant elicited information from one prospective juror that she had read an article about the case at her grandmother's house. Defendant accepted this person without asking her whether that article had affected her ability to be fair and impartial. He did not ask any of the final six prospective jurors about media exposure. Based on this record, we cannot conclude that the trial court abused its discretion. *See, e.g., State v. Barts*, 316 N.C. 666, 678-80, 343 S.E.2d 828, 837-38 (1986) (no abuse of discretion where the defendant failed to show "that the jury selection process resulted in the 'contamination' of other jurors by information from jurors previously exposed to . . . pretrial publicity"). This assignment of error is overruled.

### GUILT PHASE

Defendant next contends the trial court erred by admitting State's Exhibit 22, a sample of blood purportedly taken from the victim during the autopsy, as well as expert testimony based thereon. Defendant argues that the State did not adequately establish the exhibit's chain of custody because it failed to present evidence of: who drew the blood sample from the victim; who gave the sample to Investigator Mueller; how the sample was transferred from Mueller to Investigator Shook, who delivered it to the SBI lab; and how SBI Agent Elwell made a bloodstain from the sample which she submitted to SBI Agent Mark Boodee for DNA analysis.

Defendant objected to the portion of Elwell's testimony that relied on Exhibit 22 and to the exhibit's admission into evidence on the sole ground that "there was no testimony from anyone as to who drew that blood or when it was drawn or, in fact, that it was drawn from Mr. Ralph Childress." He now presents three additional grounds on which he contends the exhibit should have been excluded.

[12] Rule 10(b)(1) of the Rules of Appellate Procedure provides in pertinent part:

(1) . . . . In order to preserve a question for appellate review, a party must have presented to the trial court a timely request, objection or motion, *stating the specific grounds for the ruling the party desired the court to make if the specific grounds were not apparent from the context.*

(Emphasis added.) Defendant objected to the evidence on only one ground; thus, he failed to preserve the additional grounds presented on appeal. He also waived appellate review of those arguments by failing specifically and distinctly to argue plain error. N.C. R. App. P. 10(c)(4).

[13] As to the ground for objection properly preserved, this Court has stated that the person who draws a blood sample need not always testify to establish a proper foundation for the admission of the sample. *State v. Grier*, 307 N.C. 628, 632-33, 300 S.E.2d 351, 353-54 (1983). In *Grier*, the first link of the chain of custody was sufficiently proven because a doctor who had examined a rape victim "testified that although she did not actually see the blood drawn from [the victim], she signed a blood sample that was supposedly taken from the victim by a laboratory technician either immediately before or after the examination. The technician who drew the blood did not testify." *Id.* at 632, 300 S.E.2d at 353. We concluded that "[a]ny weakness in the chain of custody relate[d] only to the weight of the evidence and not to its admissibility." *Id.* at 633, 300 S.E.2d at 354.

There was sufficient evidence here to permit the inference that either Dr. Vogel or Bob Osborn, an autopsy assistant, drew the blood during the autopsy, even though Dr. Vogel was never questioned about the samples of blood and Osborn never testified. Dr. Vogel testified that Osborn was present during the autopsy. Investigator Mueller stated without objection that he received two vials of the victim's blood "directly from Dr. Vogel and Bob Osborn." Defendant calls Mueller's testimony into question by noting that Dr. Vogel did not recall seeing Mueller at the time of the autopsy. This does not, however, preclude the inference that Osborn gave Mueller the blood which either Osborn or Dr. Vogel withdrew from the victim. Any weakness in this chain of custody affected the weight, not the admissibility, of the exhibit. Thus, the trial court properly admitted the exhibit and the testimony based thereon. This assignment of error is overruled.

[14] Next, defendant complains about the prosecutors' closing arguments at the guilt and sentencing phases. He did not object to any of them but now asserts that the trial court should have intervened *ex mero motu* because they were grossly improper. Defendant contends the arguments in which the prosecutors suggested that defendant stabbed the victim several times to force him to reveal the location of

his money, but not to kill him, were unsupported by the record and represented "gross speculation bordering on fantasy." The first prosecutor to argue in closing at the guilt phase stated, *inter alia*:

> [Defendant] comes over to his house. And we don't know if he broke down the door or had problems with the door or whatever. . . . And he wants some money. . . . I am being thrown out, I've got to leave tomorrow. Okay I'll leave, but I want some money.

> Wallet's open. . . . But it was empty between his legs. No money. Where's your money? . . . Broke the knife on him. Jabbed him through the fat, through the skin, and through the bone, and broke the knife.

> [The victim] sat through five wounds to tell [where] his money [was]. He finally said okay, my money is under the mattress. That's how the defendant got the blood under the mattress. He went to get his money under the mattress. . . . Why was [the bedroom] torn up? Why that place look so messy? . . . Why was the Derringer in the kitchen? That man's alive. I'm not going to kill him until I find his money. . . . Remember the bloody Derringer was found in the sink area in the kitchen. He was just moving it around so he couldn't get it and shoot him with it. . . . The defendant is keeping him alive. Until he finds his money.

> How about the pants? The pants had [the victim's] blood. Now [the victim] was in [the] living room stabbed to death. The pants are back in the bedroom. [Defendant] cut himself. Slicing up [the victim]. . . . So [defendant] picks up [that] pair of pants, wherever they were. He wipes [his] hand off. Why? Because he's walking to the bedroom. Why? Because that's where the mattress is. Why? That's where the money is. And right when he gets to the door, he throws those pants down.

> . . . .

> Now I think you've heard [about] proximate cause from the doctor. He talked a lot about the wounds. He said the first five were not fatal. Said that makes sense, those first five were just to get him to talk. Wasn't going to kill him until he got his money. Washed everything off, went to the sink, had the handles, washed everything. And as he was leaving he gave him the deathblow after he had his money.

He also made a comparable argument at sentencing. The second pros-
ecutor argued in a similar vein, stating, *inter alia*: "And while
[defendant is] . . . searching, ransacking it, [the victim] is laying here
on the floor bleeding. He's suffering. He's not lost consciousness
because the doctor said 'Hey, those wounds to his neck wouldn't
cause him to lose consciousness.' That old man was suffering. He's
suffering."; and

> While [the victim is] alive, laying here bleeding, he's running
> through the house trying to find the money. Finds the money, then
> tries to go wash his hands. On his way out [the victim] moved.
> . . . [O]ld man, . . . you can't stay here, you know who I am, you
> can identify me.

Counsel have wide latitude to argue the law, the facts, and rea-
sonable inferences supported thereby. *State v. Syriani*, 333 N.C. 350,
398, 428 S.E.2d 118, 144, *cert. denied*, — U.S. —, 126 L. Ed. 2d 341
(1993), *reh'g denied*, — U.S. —, 126 L. Ed. 2d 707 (1994).
Prosecutors may, in closing arguments, create a scenario of the crime
committed as long as the record contains sufficient evidence from
which the scenario is reasonably inferable. *State v. Ingle*, 336 N.C.
617, 645, 445 S.E.2d 880, 895 (1994), *cert. denied*, — U.S. —, 131
L. Ed. 2d 222 (1995).

Our review of the record reveals sufficient evidence to support
the scenarios created by both prosecutors during their guilt phase
closing arguments. Dr. Vogel testified that the fatal wound was the
one in the center of the victim's chest from which a pair of scissors
was removed. The remaining wounds to the chest and neck were
painful but not fatal and were inflicted prior to the victim's death. The
mattress in the victim's bedroom was found askew and contained
blood consistent with defendant's. Blood consistent with that of the
victim was found on a pair of pants in the bedroom. Police officers
also found blood around the kitchen sink and on the faucet handles.
This evidence supports the scenario created by the prosecutors. The
arguments were not grossly improper; thus, the trial court did not err
by failing to intervene *ex mero motu*.

[15]   At sentencing the second prosecutor argued that the murder
was especially heinous, atrocious, or cruel by surmising what the vic-
tim might have thought as defendant committed the crime:

> Do you think he might have asked why Ronny, why you doing this
> to me, I loved you, I treated you like a son and you're doing this

to me? . . . Do you think that might have been a psychological torture the old man had to go through? The pain of that knife going through his chin. The slash on his throat. Laying there, blood dripping out of his neck. And the only thing he could think of was why Ronny, why?

We cannot conclude that this argument was grossly improper. In *Ingle* the victims were discovered by their grandson. The prosecutor argued in closing, over the defendant's strenuous objections, about how that young boy might remember "the day when he 'flew' into the home of his grandparents and encountered their dead bodies, finding that he could not kiss his grandma and grandpa because defendant had bludgeoned them to death." *Id.* at 644, 445 S.E.2d at 894. The defendant argued that he should receive a new trial because no evidence supported this argument. Noting that prosecutorial arguments may be permissible even though they address facts not testified to, we concluded that "[d]espite the absence of evidence of [the grandson's] . . . feelings toward his grandparents, the prosecutor's emphasis on the inherent tragedy of the episode and [the grandson's] reaction were a reasonable extrapolation of what may have been the thoughts and actions of such a boy upon encountering such a grisly scene." *Id.* at 645-46, 445 S.E.2d at 895.

Here we have the benefit of testimony regarding the relationship between the victim and defendant. Dr. Noble testified that defendant considered the victim a friend and appeared to view him as a father figure. Leroy Childress testified about the victim's willingness to forgive defendant's debts in exchange for work around the house and yard. The evidence portrayed the relationship between the two as one of trust and kindness. This created a basis, stronger than that present in *Ingle*, from which the prosecutor could reasonably extrapolate the victim's thoughts as defendant ruthlessly attacked him. Therefore, the argument was not grossly improper.

[16] Defendant also asserts that both prosecutors referred to the victim's wounds as "slashes" and "stabs" when some were only minor lacerations. This, defendant asserts, falsely portrayed the gravity of the wounds. We conclude that the language used, while perhaps hyperbolic, was neither inflammatory nor grossly improper. It did not fall outside the latitude granted counsel in closing arguments. We hold that none of the arguments complained of in these assignments of error required the trial court to intervene *ex mero motu*.

**[17]** Defendant argues that the evidence was insufficient to support a conviction based on malice, premeditation, and deliberation. Therefore, only the theory of felony murder, with robbery with a dangerous weapon as the underlying felony, should have been submitted to the jury. Had the trial court submitted this theory alone, the State would not have been allowed to submit as an aggravating circumstance that the murder was committed while defendant was engaged in the commission of a robbery with a dangerous weapon; therefore, defendant contends, he must have a new sentencing hearing at which this aggravating circumstance is not submitted. We disagree.

Before a trial court submits the charge of first-degree murder, it must determine whether the evidence, taken in a light most favorable to the State, shows that defendant "thought about the act [of murder] for some length of time, however short, before the actual killing; no particular amount of time is necessary to illustrate that there was premeditation." *State v. Sierra*, 335 N.C. 753, 758, 440 S.E.2d 791, 794 (1994). Evidence of premeditation and deliberation is usually circumstantial. *Id.*

Defendant contends the uncontroverted evidence shows that he entered the victim's home with the intent to rob, not to kill. Even if true, that does not foreclose the existence of premeditation and deliberation, which could have arisen at any time before, during, or after the robbery. For example, in *State v. Thomas*, 332 N.C. 544, 423 S.E.2d 75 (1992), the defendant argued that he had not formed the intent to kill when his fatal assault of the victim began and therefore that the charge of first-degree murder on the theory of premeditation and deliberation should not have been submitted. We found no error, stating, "[i]t is clear that defendant's intent to kill the victim could have developed at any time prior to the beating, during the beating, or after the beating." *Id.* at 561, 423 S.E.2d at 85.

Our review of the evidence reveals numerous circumstances from which premeditation and deliberation are inferable. First, a lack of provocation on the victim's part supports such an inference. *State v. Olson*, 330 N.C. 557, 565, 411 S.E.2d 592, 596 (1992). The evidence shows that the victim was felled in his living room near the front door. There is no evidence that the victim provoked defendant into stabbing him. Second, the evidence permits the inferences that defendant struck the deadly blow after felling the victim and rendering him defenseless and that he used a second deadly weapon, scissors, after the first one, a knife, broke from the force of his attack. These also

support a finding of premeditation and deliberation. *See State v. Vause*, 328 N.C. 231, 239, 400 S.E.2d 57, 62 (1991). Third, premeditation and deliberation may be inferred where, as here, the evidence tends to show that the defendant killed his victim to avoid apprehension. *See State v. Brown*, 315 N.C. 40, 59, 337 S.E.2d 808, 822 (1985), *cert. denied*, 476 U.S. 1164, 90 L. Ed. 2d 733 (1986), *overruled on other grounds by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988). From the foregoing we conclude that the trial court properly submitted the charge of first-degree murder based on premeditation and deliberation. This assignment of error is overruled.

[18] Next, defendant argues that the trial court erred by failing to instruct on the charge of second-degree murder. Defendant neither requested such an instruction nor objected to its absence, but he now contends the court committed plain error.

It is well established that

[i]f the evidence is sufficient to fully satisfy the State's burden of proving each and every element of the offense of murder in the first degree, including premeditation and deliberation, and there is *no* evidence to negate these elements other than defendant's denial that he committed the offense, the trial [court] should properly exclude from jury consideration the possibility of a conviction of second degree murder.

*State v. Strickland*, 307 N.C. 274, 293, 298 S.E.2d 645, 658 (1983), *overruled in part on other grounds by State v. Johnson*, 317 N.C. 193, 344 S.E.2d 775 (1986). Defendant argues that because the evidence of premeditation and deliberation conflicted, the court had to instruct on second-degree murder. As noted above, however, uncontroverted evidence supported an inference of premeditation and deliberation. Defendant's assertion that he had the intent only to rob when he arrived at the victim's house does not negate or contradict the State's proof of premeditation and deliberation. Investigator Greg Shook's testimony that he had the impression that a struggle had occurred in the victim's house, without more, is insufficient to require a second-degree murder instruction. Evidence of a struggle during the commission of a felony does not necessarily entitle a defendant to an instruction on a lesser charge. *See Thomas*, 332 N.C. at 560-62, 423 S.E.2d at 84-85 (evidence of struggle during a sexual assault which resulted in the victim's death did not require trial court to instruct on second-degree murder where State proved every element of first-degree murder). We conclude that the evidence did not support sub-

mission of the charge of second-degree murder. This assignment of error is overruled.

SENTENCING PHASE

[19] Defendant argues that the trial court erred by submitting the aggravating circumstance that the murder was especially heinous, atrocious, or cruel. *See* N.C.G.S. § 15A-2000(e)(9) (Supp. 1994). He contends that the evidence was insufficient to support submission of the circumstance and that the trial court's action violated the Eighth and Fourteenth Amendments to the United States Constitution. We disagree.

In determining whether the evidence is sufficient to submit this aggravating circumstance, it must be considered in the light most favorable to the State. *State v. Quick*, 329 N.C. 1, 31, 405 S.E.2d 179, 197 (1991). "[T]he State is entitled to every reasonable . . . inference to be drawn [from the evidence]; contradictions and discrepancies are for the jury to resolve . . . and all of the evidence . . . admitted . . . which is favorable to the State is to be considered." *State v. Powell*, 299 N.C. 95, 99, 261 S.E.2d 114, 117 (1980).

We have held that "killings which are less violent, but involve infliction of psychological torture by leaving the victim in his last moments aware of but helpless to prevent impending death" warrant submission of the circumstance. *State v. Hamlet*, 312 N.C. 162, 175, 321 S.E.2d 837, 846 (1984). The evidence here permits the inference that defendant's crime involved psychological torture. The victim, defendant's landlord, had forgiven defendant's rent payments in exchange for yard work. Defendant viewed the victim as a benign father figure, indicating that the men trusted and were kind to each other. The victim would have admitted defendant into his home in the middle of the night without suspecting that defendant would attack him. This relationship, while not quite as close as a familial one, rendered the offense more egregious than normal. *See State v. Greene*, 324 N.C. 1, 25-26, 376 S.E.2d 430, 445 (1989) (murder of father by son distinguished from other robbery-murders because of relationship between killer and victim), *sentence vacated on other grounds*, 494 U.S. 1022, 108 L. Ed. 2d 603 (1990), *on remand*, 329 N.C. 771, 408 S.E.2d 185 (1991).

Medical evidence raises the inference that five wounds were inflicted to the victim's neck and chest before the sixth and fatal stab wound. The preliminary wounds would have caused pain but not

**STATE v. FRYE**

[341 N.C. 470 (1995)]

unconsciousness; one cut was deep enough to hit bone. The fatal stab wound, which tore a hole in the victim's aorta, caused him to bleed to death. He would not have lost consciousness immediately but would probably have remained conscious for about two minutes.

The physical evidence showed that defendant used two different weapons. He first used a sharp knife, resorting to scissors when the knife blade broke off of the handle. The telephone had been torn from the wall in the bedroom, which was completely ransacked. It is reasonable to infer from this that the victim was still alive while defendant searched the room for money. The blood found in the bedroom, some of which matched the victim's, raises the further inference that defendant cut the victim, leaving him to bleed and feel pain, but not to die, before he went on his rampage in the bedroom. Defendant inflicted the fatal blow before leaving the house because he knew the victim could identify him.

A reasonable juror could have found from the foregoing evidence that the murder was especially heinous, atrocious, or cruel. Thus, the trial court did not err by submitting the (e)(9) circumstance.

[20] Defendant argues that the evidence was insufficient to support submission of the statutory mitigating circumstance that defendant had no significant history of prior criminal activity. *See* N.C.G.S. § 15A-2000(f)(1). He also argues that the court should not have allowed the State to present evidence of his criminal record in rebuttal at sentencing. Although no juror found the circumstance to exist, defendant contends its submission affected the jury's weighing process and therefore is harmful error.

Before a trial court submits the (f)(1) circumstance, it must "determine whether a rational jury could conclude that defendant had no *significant* history of prior criminal activity." *State v. Wilson*, 322 N.C. 117, 143, 367 S.E.2d 589, 604 (1988). A significant history for purposes of this circumstance is one likely to influence the jury's sentence recommendation. *State v. Sexton*, 336 N.C. 321, 375, 444 S.E.2d 879, 910, *cert. denied*, — U.S. —, 130 L. Ed. 2d 429 (1994). In reviewing this issue, "it is this Court's duty only to review the evidence brought forth at trial." *Ingle*, 336 N.C. at 643, 445 S.E.2d at 893.

A review of the record indicates that evidence of defendant's criminal past consisted of testimony regarding his extensive use of illicit drugs and the testimony of Paul Burgess, who stated that he had dealt with defendant often in his capacity as chief jailer at the

Catawba County jail. Burgess testified that he had "dealt with [defendant] a number of times over the years" when defendant was "in jail for reasons."

As defendant notes, we stated in *State v. Rouse*, 339 N.C. 59, 100, 451 S.E.2d 543, 566 (1994), *reconsideration denied*, 339 N.C. 619, 453 S.E.2d 188, *cert. denied*, —— U.S. ——, —— L. Ed. 2d ——, 64 U.S.L.W. 3241 (1995), that the (f)(1) circumstance should not be submitted where "the references to criminal activity are made not with regard to this mitigating circumstance but in other contexts for other reasons." *Id.* Defendant requested that the court submit the circumstance. He presented no evidence expressly directed at this or any other circumstance, but he presented witnesses who testified about his drug use and his numerous prior periods of incarceration. The trial court properly could have viewed this evidence as offered to support this mitigating circumstance. Thus, *Rouse* does not entitle defendant to a new sentencing proceeding.

We held in *Ingle* that the record contained sufficient evidence to warrant submission of the (f)(1) circumstance where it showed that the defendant had used illegal drugs and that his aunt had taken out warrants on him for communicating threats and trespassing. *Ingle*, 336 N.C. at 643, 445 S.E.2d at 893. Following *Ingle*, we hold that the evidence here was sufficient to support submission of the circumstance. We further hold that the trial court properly allowed the State to present evidence of defendant's criminal record in rebuttal. *See Brown*, 315 N.C. at 64, 337 S.E.2d at 826 (1985) (State "is entitled to offer evidence designed to rebut mitigating circumstances . . . after the defendant offers evidence in support of [them].")."). These assignments of error are overruled.

[21] Defendant next assigns as error the trial court's refusal to submit the nonstatutory mitigating circumstance that defendant's alcohol intoxication impaired his abilities to conform his behavior to the requirements of law. Defendant timely requested this circumstance in writing. The trial court concluded, however, that it was subsumed within the statutory mitigating circumstance that the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired, N.C.G.S. § 15A-2000(f)(6).

Trial courts may combine redundant mitigating circumstances. *See Greene*, 324 N.C. at 19-21, 376 S.E.2d at 441-43. We agree that the requested nonstatutory circumstance was covered by the (f)(6) cir-

cumstance, which was submitted and found. Further, the trial court instructed on three nonstatutory circumstances regarding defendant's alcohol problems as well as on the circumstance that defendant had diminished capacity to conform his social behavior to social norms at the time of the offense. Finally, the court instructed on the "catchall" mitigating circumstance, N.C.G.S. § 15A-2000(f)(9). Therefore, the jury was not precluded from hearing or considering mitigating evidence regarding defendant's alcohol abuse and its effect on his mental capacity. This assignment of error is overruled.

Next, defendant argues that the trial court erred by failing to intervene *ex mero motu* during the prosecutors' closing arguments at sentencing. He points to three specific types of arguments: (1) those which misstated the law and diminished the jury's sense of responsibility for the verdict, (2) those which criticized the capital sentencing statute, and (3) those which strayed beyond the facts in evidence. Defendant objected to none of the arguments; thus, we will find error only if the statements were so grossly improper as to warrant the trial court's *ex mero motu* intervention. *Rouse*, 339 N.C. at 91, 451 S.E.2d at 560.

**[22, 23]** First, defendant contends both prosecutors misstated the law and diminished the jury's sense of responsibility for its recommendation. The first prosecutor stated that

> everybody [who is] tried for murder and then goes to phase two should be treated equally. Everybody treated alike. If this jury feels sympathy and lets him go, he's not treated the same. . . . So this isn't an issue of sir, what do you feel?, ma'am, what do you feel? This is follow the law. Follow the law. You don't have to struggle with your own emotions oh, did I want to kill him.

The second prosecutor likewise stated, "It's not about mercy. It's about following the law."

Defendant contends these comments misstated the law in that the United States Supreme Court has held that the Eighth Amendment to the United States Constitution requires an individualized assessment regarding whether a death sentence is appropriate. *See Penry v. Lynaugh*, 492 U.S. 302, 317, 106 L. Ed. 2d 256, 277 (1989). Further, they falsely informed jurors that sympathy, mercy, and personal beliefs should play no part in the sentence recommendation. Defendant finally contends the comments improperly diminished the jury's sense of responsibility for its recommendation. By repeatedly

telling the jury to follow the law, the prosecutors implied that the law, not the jury, was responsible for a recommendation of death.

We consider these remarks within their context, including the factual circumstances to which they referred. The record indicates that the above statements were in response to.the following argument made by defense counsel:

> As I said you have to answer in your own minds two questions. The first question is do I really, do I want to kill [defendant]? Each of you has to make that personal decision. And second, do I have to kill [defendant]? Is it necessary for society or for protection to kill [him]? I submit to you, and I argue to you, that the answer to both of these questions is no.

Given this context, the prosecutors' statements were reminders to the jury that it should be guided by the law, not by emotions, and that all persons are treated alike under the law. This is not grossly improper. Further, prosecutors may properly argue to the sentencing jury that its decision should be based not on sympathy, mercy, or whether it wants to kill the defendant, but on the law. *Rouse*, 339 N.C. at 93, 451 S.E.2d at 561-62. It follows that the comments here did not misstate the law. Finally, the arguments did not diminish the jury's sense of responsibility by telling it to follow the law. Juries are to exercise guided discretion when making the findings required by the capital sentencing statute. *State v. Pinch*, 306 N.C. 1, 33-34, 292 S.E.2d 203, 227, *cert. denied*, 459 U.S. 1056, 74 L. Ed. 2d 622 (1982), *reh'g denied*, 459 U.S. 1189, 74 L. Ed. 2d 1031 (1983), *overruled on other grounds by State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988), *and by State v. Robinson*, 336 N.C. 78, 443 S.E.2d 306 (1994), *cert. denied*, —— U.S. ——, 130 L. Ed. 2d 650 (1995). The law, as instructed by the court, constitutes the jury's guide in exercising its discretion. *Id.* Thus, the prosecutors correctly told the jurors to follow the law.

[24] Second, defendant contends one of the prosecutors improperly criticized the capital sentencing statute by arguing that the State is restricted in the presentation of aggravating circumstances while the defense can "play a numbers game" and "come up with as many [mitigating circumstances] as [it] want[s] to." Defendant asserts such comments disparaged his right to present evidence in mitigation and misled the jury into believing that defendants may submit anything as a mitigating circumstance, regardless of whether the evidence supports its submission. We disagree.

Read in context, the comment was intended to attack the weight of the mitigating circumstances and to convince the jury that the fifty-nine mitigating circumstances could not outweigh the two aggravating circumstances. Further, the argument was more innocuous than some we have upheld in other cases. For example, we found no gross impropriety when a prosecutor argued that the law required submission of any mitigating circumstance imaginable and that some of the defendant's proposed mitigating circumstances "border[ed] on the ridiculous." *State v. Basden,* 339 N.C. 288, 304-05, 451 S.E.2d 238, 247 (1994), *cert. denied,* — U.S. —, 132 L. Ed. 2d 845 (1995). The statements here, as in *Basden,* were not grossly improper.

[25] Third, defendant posits that the prosecutor argued outside the evidence when he stated that defendant was a Type H inmate, "the most dangerous there are." We conclude that the statement was a reasonable extrapolation from the testimony of Dr. Noble. He testified that Type H inmates, such as defendant, "are some of the most disturbed prison inmates" and "are more likely than other prisoners . . . to be psychotic and diagnosed by their medical staff as psychotic." Such inmates "typically have been hard drug users before they went into the jail." Mindful of the wide latitude accorded prosecutors in their closing arguments, we conclude that this argument was not grossly improper.

We hold that none of the arguments complained of in these assignments of error were grossly improper. Thus, the trial court did not err by failing to intervene *ex mero motu.*

Defendant also argues that the trial court gave erroneous instructions on two statutory mitigating circumstances: mental or emotional disturbance, N.C.G.S. § 15A-2000(f)(2); and impaired capacity, N.C.G.S. § 15A-2000(f)(6). Defendant contends the court improperly instructed in the conjunctive for both circumstances, thereby constricting the scope of each. The jury found both circumstances. We review this issue for plain error because defendant did not object to the instructions at trial. *See State v. Payne,* 337 N.C. 505, 526-29, 448 S.E.2d 93, 106-07 (1994), *cert. denied,* — U.S. —, 131 L. Ed. 2d 292 (1995).

[26, 27] The trial court instructed that the jury would find the (f)(2) circumstance if it determined that defendant was under the influence of a mental and/or emotional disturbance at the time of the murder as a result of "paranoid disorder, mixed substance abuse disorder, mixed personality disorder, and child abuse syndrome." Similarly, the

court instructed the jury to find the (f)(6) circumstance if it found "that the defendant suffered from paranoid disorder, mixed substance abuse disorder, mixed personality disorder and substance abuse syndrome, and that this impaired his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law." Defendant maintains that the use of "and" in these instructions impeded the jury's consideration of "significant mitigating evidence." We disagree.

The court's instructions here did not preclude the jury from considering mitigating evidence. The court stated, with respect to the (f)(2) circumstance, that "it is enough that the defendant's mind or emotions were disturbed from any cause." This permitted the jury to consider any or all of defendant's psychological problems in the context of that circumstance. As to the (f)(6) circumstance, Dr. Noble never testified that any one of defendant's disorders alone resulted in impaired capacity. He did testify that defendant's history of drug abuse exacerbated his paranoia and that "intoxicants *and* psychosis [were] driving his behavior" at the time of the crime. (Emphasis added.) Thus, both instructions basically comported with defendant's evidence and were not plain error.

Defendant also disputes the trial court's instruction on the (f)(6) circumstance on the ground that it did not include child abuse syndrome or intoxication as factors to be considered in determining whether the circumstance existed. He contends these omissions improperly precluded the jury from considering mitigating evidence. Again, we disagree.

[28] The record contains no evidence that defendant was intoxicated at the time of the murder. It indicates that defendant smoked crack cocaine on the Friday night preceding the Sunday morning murder; it further shows that defendant walked unsteadily on the Saturday night before the murder. None of this evidence establishes that defendant was intoxicated when he killed the victim sometime after 2:00 a.m. Sunday morning. Thus, the trial court properly omitted intoxication as a factor from its instruction on impaired capacity.

[29] Assuming *arguendo* that the trial court should have included child abuse syndrome in the instruction on the (f)(6) circumstance, we find the error harmless beyond a reasonable doubt. The jury heard Dr. Noble testify at length about the physical abuse defendant endured in a foster home. It also heard Dr. Noble opine that defendant suffered from child abuse syndrome. The trial court submitted the

**STATE v. FRYE**

[341 N.C. 470 (1995)]

"catchall" mitigating circumstance, which no juror found. Thus, the instruction at issue did not improperly restrict the jury's consideration of mitigating evidence, and any error is harmless beyond a reasonable doubt. These assignments of error are overruled.

**[30]** Defendant contends the trial court erred by failing to individually instruct on each of the fifty-four nonstatutory mitigating circumstances submitted. The court instructed:

> You should also consider circumstances five through 58 arising from the evidence which you find to have mitigating value. If one or more of you find by a preponderance of the evidence that any one of the following circumstances, that being numbers five through 58, exist and also are deemed by you to have mitigating value, you would so indicate by having your foreman write yes in the space provided.

The court did not name the particular circumstances in question. Defendant asserts that this instruction diminished the importance of the nonstatutory mitigating circumstances, thereby discouraging the jury's full consideration of them in violation of *Lockett v. Ohio*, 438 U.S. 586, 57 L. Ed. 2d 973 (1978), and its progeny.

Assuming error *arguendo*, we conclude that it was harmless beyond a reasonable doubt. The jury heard and was instructed to consider all the evidence defendant proffered in mitigation. Trial courts are not required to state, summarize, or recapitulate evidence which might support submitted mitigating circumstances. N.C.G.S. § 15A-1232 (1988). All fifty-four nonstatutory mitigating circumstances were listed individually on the Issues and Recommendation as to Punishment form. The jury found thirty-two of them; it also found two statutory mitigating circumstances. The trial court submitted, but the jury did not find, the "catchall" circumstance. Despite the substantial amount of mitigating evidence, the jury recommended a sentence of death. Based on the foregoing, we cannot hold that defendant was prejudiced by the court's failure to repeat fifty-four times the mechanics by which the jury might answer "yes" to any of the nonstatutory mitigating circumstances. This assignment of error is overruled.

### PRESERVATION ISSUES

Defendant presents numerous preservation issues that, as he acknowledges, we have decided contrary to his position: (1) the trial court erred by denying defendant's motion for individual *voir dire*

and sequestration of prospective jurors; (2) the trial court erred by excusing for cause prospective jurors who expressed an unwillingness to impose the death penalty, thereby creating a death-qualified jury "biased in favor of the prosecution and prone to find . . . defendant guilty"; (3) the trial court erred in its instructions regarding nonstatutory mitigating circumstances because it allowed a juror to reject those he or she deemed to have no mitigating value; (4) the trial court erred by using the words "satisfaction" and "satisfy" in its definition of the burden of proof applicable to mitigating circumstances; (5) the trial court erred by defining a mitigating circumstance as a fact or group of facts that may extenuate or reduce the moral culpability of the killing because that precluded consideration of evidence of defendant's character; (6) the trial court erred by using the word "may" in its instructions regarding Issues Three and Four because this allowed jurors to ignore proven mitigating circumstances; (7) the trial court erroneously instructed that each juror should consider at Issues Three and Four only those mitigating circumstances found by that juror at Issue Two; and (8) the trial court erred by instructing the jury that it had a "duty" to recommend a sentence of death if it determined that the mitigating circumstances found were insufficient to outweigh the aggravating circumstances and that the aggravating circumstances were sufficiently substantial to warrant the imposition of the death penalty. Defendant presents no compelling reason to overrule our precedents on these issues.

Defendant also presents two issues which he should have treated as preservation issues: (1) the trial court erred by denying his pretrial motion to permit questioning of prospective jurors regarding their beliefs about parole eligibility; and (2) the trial court erred by giving an instruction on the "especially heinous, atrocious, or cruel" aggravating circumstance that did not adequately limit the application of this inherently vague circumstance. We have decided both of these issues contrary to defendant's position and perceive no reason to depart from our holdings. These assignments of error are overruled.

PROPORTIONALITY REVIEW

[31] Having found no error in either the guilt or sentencing phase, we must determine whether: (1) the evidence supports the aggravating circumstances the jury found; (2) passion, prejudice, or "any other arbitrary factor" influenced the imposition of the death sentence; and (3) the sentence is "excessive or disproportionate to the penalty

imposed in similar cases, considering both the crime and the defendant." N.C.G.S. § 15A-2000(d)(2).

The jury found defendant guilty of first-degree murder under the theory of malice, premeditation, and deliberation, as well as under the felony murder rule. It also convicted defendant of robbery with a dangerous weapon. The trial court submitted two aggravating circumstances, both of which the jury found: that the murder was committed while defendant was engaged in a robbery with a dangerous weapon, N.C.G.S. § 15A-2000(e)(5); and that the murder was especially heinous, atrocious, or cruel, N.C.G.S. § 15A-2000(e)(9). We conclude that the evidence supports both circumstances. We further conclude, based on our thorough review of the record, that the sentence of death was not imposed under the influence of passion, prejudice, or any other arbitrary factor. We therefore consider proportionality.

One purpose of proportionality review "is to eliminate the possibility that a person will be sentenced to die by the action of an aberrant jury." *State v. Holden*, 321 N.C. 125, 164-65, 362 S.E.2d 513, 537 (1987), *cert. denied*, 486 U.S. 1061, 100 L. Ed. 2d 935 (1988). Another is to guard "against the capricious or random imposition of the death penalty." *State v. Barfield*, 298 N.C. 306, 354, 259 S.E.2d 510, 544 (1979), *cert. denied*, 448 U.S. 907, 65 L. Ed. 2d 1137, *reh'g denied*, 448 U.S. 918, 65 L. Ed. 2d 1181 (1980). We compare this case to others in the pool, which we defined in *State v. Williams*, 308 N.C. 47, 79-80, 301 S.E.2d 335, 355, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 177, *reh'g denied*, 464 U.S. 1004, 78 L. Ed. 2d 704 (1983), and *State v. Bacon*, 337 N.C. 66, 106-07, 446 S.E.2d 542, 563-64 (1994), *cert. denied*, —— U.S. ——, 130 L. Ed. 2d 1083 (1995), that "are roughly similar with regard to the crime and the defendant." *State v. Lawson*, 310 N.C. 632, 648, 314 S.E.2d 493, 503 (1984), *cert. denied*, 471 U.S. 1120, 86 L. Ed. 2d 267 (1985). Whether the death penalty is disproportionate "ultimately rest[s] upon the 'experienced judgments' of the members of this Court." *State v. Green*, 336 N.C. 142, 198, 443 S.E.2d 14, 47, *cert. denied*, —— U.S. ——, 130 L. Ed. 2d 547 (1994).

This case has several distinguishing features. The jury convicted defendant under both the felony murder rule and the theory of malice, premeditation, and deliberation. "The finding of premeditation and deliberation indicates a more cold-blooded and calculated crime." *State v. Artis*, 325 N.C. 278, 341, 384 S.E.2d 470, 506 (1989), *sentence vacated on other grounds*, 494 U.S. 1023, 108 L. Ed. 2d 604

(1990), *on remand*, 329 N.C. 679, 406 S.E.2d 827 (1991). Further, the victim was killed in his own living room in the middle of the night. A murder in the home "shocks the conscience, not only because a life was senselessly taken, but because it was taken [at] an especially private place, one [where] a person has a right to feel secure." *State v. Brown*, 320 N.C. 179, 231, 358 S.E.2d 1, 34, *cert. denied*, 484 U.S. 970, 98 L. Ed. 2d 406 (1987). Defendant chose to kill a person who had treated him with kindness and compassion, one whom he viewed as a friend and father figure. A quasi-familial relationship between a defendant and his victim renders a murder more dehumanizing than normal. *See Greene*, 324 N.C. at 25-26, 376 S.E.2d at 445. Additionally, there is evidence that the victim suffered physical and psychological torture before he died. Dr. Vogel testified that the victim would not have lost consciousness prior to his death; thus, he was not only in pain but also aware of his impending death as he lay bleeding on his living room floor. Finally, the victim, age seventy, would have been unequal in physical strength to defendant, a healthy thirty-four-year-old man. These features distinguish this case from those in which we have held the death penalty disproportionate.

Defendant argues that his sentence is disproportionate for several reasons, including: (1) the jury found thirty-four of the fifty-nine mitigating circumstances submitted, and (2) the killing was "a simple robbery-murder." The sheer volume of mitigating circumstances does not suffice to render a death sentence disproportionate. Even a "single aggravating circumstance may outweigh a number of mitigating circumstances and . . . be sufficient to support a death sentence." *Bacon*, 337 N.C. at 110, 446 S.E.2d at 566. Here only five of the mitigating circumstances submitted were statutory, including the "catchall," and the jury found only two of them—impaired capacity and mental or emotional disturbance. Significantly, all but four of the nonstatutory mitigating circumstances found were directly related to those two statutory circumstances. Seventeen related to defendant's dysfunctional childhood, which Dr. Noble linked to defendant's mental disorders. Six were directed at defendant's drug and alcohol abuse, which exacerbated the mental problems created by his childhood experiences. Five listed the specific disorders diagnosed by Dr. Noble.

We have held a death sentence proportionate where only one aggravating circumstance was found and thirty-eight of forty-one mitigating circumstances were found. *State v. Lynch*, 340 N.C. 435, 483-84, 459 S.E.2d 679, 704-05 (1995). Here the jury found two aggravating cir-

cumstances, including that the murder was especially heinous, atrocious, or cruel. Under *Lynch*, defendant's sentence is not disproportionate simply because the jury found numerous mitigating circumstances.

Defendant points to several cases in which juries have returned life sentences and argues that they require us to hold his sentence disproportionate. While we cannot distinguish all of them from this case, "the fact that one, two, or several juries have returned recommendations of life imprisonment in cases similar to the one under review does not automatically establish that juries have 'consistently' returned life sentences in factually similar cases." *Green*, 336 N.C. at 198, 443 S.E.2d at 47.

Based on the nature of this crime, particularly the features noted above, we cannot conclude as a matter of law that the sentence of death was disproportionate. We hold that defendant received a fair trial and sentencing proceeding, free of prejudicial error.

NO ERROR.