PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

RONALD WAYNE FRYE,
　　　　　　　*Petitioner-Appellant,*

　　　　　　v.

R. C. LEE, Warden, Central Prison,
Raleigh, North Carolina,
　　　　　　　*Respondent-Appellee.*

No. 00-7

Appeal from the United States District Court
for the Western District of North Carolina, at Statesville.
Lacy H. Thornburg, District Judge.
(CA-99-108-5-T)

Argued: September 26, 2000

Decided: December 22, 2000

Before WILKINSON, Chief Judge, and MOTZ and
KING, Circuit Judges.

_____

Certificate of appealability denied and appeal dismissed by published opinion. Judge King wrote the opinion, in which Chief Judge Wilkinson and Judge Motz joined.

_____

## COUNSEL

**ARGUED:** Marilyn Gerk Ozer, William F.W. Massengale, MASSENGALE & OZER, Chapel Hill, North Carolina, for Appellant. Edwin William Welch, Special Deputy Attorney General, NORTH CAROLINA ATTORNEY GENERAL'S OFFICE, Raleigh, North Carolina, for Appellee.

**OPINION**

KING, Circuit Judge:

Ronald Wayne Frye, sentenced to death by the State of North Carolina for the crime of first-degree murder, seeks relief in this Court following the district court's refusal to grant his petition for a writ of habeas corpus. Because we conclude that Frye has failed to make a substantial showing of the denial of a constitutional right, we decline to grant Frye a certificate of appealability, and we dismiss his appeal.

I.

Frye was sentenced to death on November 15, 1993, in the Superior Court of Catawba County, North Carolina, for the murder of his landlord. The Supreme Court of North Carolina affirmed Frye's conviction, *State v. Frye*, 461 S.E.2d 664 (N.C. 1995), and the Supreme Court of the United States denied certiorari. *Frye v. North Carolina*, 517 U.S. 1123 (1996). Frye then initiated post-conviction proceedings in the Superior Court of Catawba County ("MAR court"). The MAR court denied Frye's Motion for Appropriate Relief ("MAR"), with its written decision setting forth findings of fact and conclusions of law. *State v. Frye*, No. 93 CRS 1884, No. 93 CRS 3215 (N.C. Super. Ct. April 24, 1998) (hereinafter cited as "*MAR Hearing*"). That decision was upheld on April 8, 1999, when the Supreme Court of North Carolina denied certiorari. *State v. Frye*, 535 S.E.2d 34 (N.C. 1999).

Pursuant to 28 U.S.C. § 2254, Frye petitioned for a writ of habeas corpus in the district court for the Western District of North Carolina. The Warden ("State") moved for summary judgment, which the district court granted by its Memorandum of Opinion dated March 9, 2000. *Frye v. Lee*, 89 F. Supp. 2d 693 (W.D.N.C. 2000). On May 30, 2000, the court denied Frye's application for a certificate of appealability.[1]

---

[1] Pursuant to 28 U.S.C. § 2253(c)(2), "a certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right."

Frye now appeals to this Court, asserting two constitutional defects in the imposition of his death sentence. First, Frye claims that he has been denied his Sixth Amendment right to the effective assistance of counsel, alleging, inter alia, that his two court-appointed lawyers failed to adequately prepare for and present mitigation evidence during the sentencing phase of his jury trial. Second, Frye asserts that certain jury instructions given during the sentencing phase, specifically those relating to the statutory aggravating circumstance of "heinous, atrocious, or cruel" murder, were unconstitutionally vague and overbroad.

A.

The facts underlying this case, summarized below, are largely drawn from the accounts related by the state courts — the Supreme Court of North Carolina and the MAR court. *See* 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.").

On January 24, 1993, Frye committed the crime of first-degree murder in Catawba County, when he repeatedly rammed a pair of scissors into the neck and chest of his seventy-year-old landlord, Ralph Childress. Local police, responding to a call from the decedent's brother, found Mr. Childress dead on the floor of his home with a pair of scissors protruding from his chest. An empty wallet was discovered on the floor of the house, and blood stains appeared throughout the residence. Childress had been stabbed five other times. Three days later, the police arrested Frye at the apartment of a local crack dealer.

Frye was thereafter tried in the Superior Court of Catawba County for first-degree murder and for robbery with a dangerous weapon. The prosecution case against Frye was, in a word, substantial. The testimony revealed that, on the day before the murder, Childress had ordered Frye to vacate his trailer for failing to pay rent. A crack cocaine dealer, Michael Ramseur, testified for the prosecution that Frye, just prior to the murder, had attempted to enlist him to rob Childress. According to Ramseur, Frye wanted a third party to commit the

robbery because Frye knew that he would be recognized. Ramseur refused Frye's request. On the day after Childress's murder, Frye, who had been without sufficient funds to satisfy his drug habit, was able to purchase crack cocaine with a thick wad of money. Another witness, Kevin Templeton, testified that Frye told him about robbing and killing Childress. According to Templeton, Frye only intended to rob Childress but "got carried away." Other testimony established that, around the time of the murder, Frye developed cuts on his hand and somehow obtained large amounts of cash.

The physical evidence implicating Frye was overwhelming. Frye's blood was found at the murder scene on a mattress, on a knife, and on one of Childress's pistols. Blood discovered on Frye's jacket matched that of the victim. Frye's attorneys presented no evidence in defense during the trial's guilt phase. The jury convicted Frye of first-degree murder, and it also convicted him of robbery with a dangerous weapon.

Frye's court-appointed lawyers, Theodore Cummings and Thomas Portwood, possessed a legitimate tactical basis for not presenting evidence of their client's innocence. Their plan was to instead focus on avoiding the death penalty by presenting mitigation evidence to the jury during the trial's sentencing phase.[2] This plan was frustrated, however, by Frye's insistence that none of his family members be contacted. Frye specifically instructed his attorneys that he "would not permit contact with his family and friends," and would not permit them "to assist in forming mitigating factors[.]" *MAR Hearing* at 6, 9. Frye's lawyers "fully informed" Frye about the consequences of his decision and "the importance of using family members to develop mitigating circumstances." *Id.* at 11. However, Frye "maintained [his] position throughout the trial." *Id.* at 9.

In an effort to deal with the problem created by Frye's instructions that family members not participate in his defense, Portwood and

---

[2]North Carolina law provides that "[u]pon conviction or adjudication of guilt of a defendant of a capital felony, the court shall conduct a separate sentencing proceeding to determine whether the defendant should be sentenced to death or life imprisonment." N.C. Gen. Stat. § 15A-2000(a)(1) (1999).

Cummings arranged two separate psychological evaluations of their client. The first evaluation occurred more than four months before the trial, at Dorothea Dix Hospital in Raleigh, North Carolina. At the hospital, a psychiatrist performed an extensive analysis of Frye's psychological state for use by his attorneys in their death penalty defense.

Two weeks before trial, when it was clear that neither Frye nor his family members would testify, Portwood and Cummings contacted a clinical forensic psychologist, Dr. Noble, to secure another evaluation of Frye and to gather evidence as to his mental state and possible mitigating circumstances. While interviewing with Dr. Noble, Frye recounted a particularly troubled personal history: at the age of four, he was given away at a restaurant by his parents to a family of strangers; he was severely beaten and subjected to extreme physical torture by the father of that family; subsequently, he had lived in several foster homes. Later, as a teenager, Frye dropped out of high school and abused drugs. He had very few friends — one of whom had been Mr. Childress, the victim. Moreover, Frye had excessive fears of being conspired against and of being persecuted.

During the trial's sentencing phase, Dr. Noble was called as a defense witness and asserted that Frye suffered from paranoia, mixed substance abuse, mixed personality, and child abuse syndrome. Dr. Noble also testified that Frye possessed a "diminished capacity to know right from wrong and to conform his behavior to social requirements." *Frye*, 461 S.E.2d at 671. On cross-examination, however, Dr. Noble admitted that his knowledge of Frye's personal history was limited to what Frye had told him, since Frye had specifically instructed him not to contact family members. In his closing argument in the sentencing phase, the prosecutor attacked Dr. Noble's testimony by suggesting that Frye may have lied to Noble about the horrors of his childhood.

Frye's defense attorneys presented one other witness at the sentencing phase. One of Frye's jailers testified that Frye was well-behaved in custody, having adapted well to prison life. The prosecution then presented rebuttal evidence consisting of Frye's criminal record, which included convictions for destruction of property, resisting arrest and assaulting an officer, felonious breaking and entering, and various drug crimes.

In furtherance of his defense, Frye's attorneys presented the jury with fifty-nine "mitigating circumstances."[3] Under North Carolina law, if a single juror finds a mitigating circumstance present, the jury is instructed to answer "Yes" on the verdict form, indicating the presence of that circumstance. *See State v. Meyer*, 412 S.E.2d 339, 345-46 (N.C. 1992). In Frye's case, the jury answered "Yes" to thirty-four of the fifty-nine asserted mitigating circumstances. However, the jury also found the aggravating circumstances of the Childress murder to outweigh those in mitigation, and it recommended a sentence of death.[4] The trial judge accepted the jury's recommendation and imposed the death penalty.

## B.

As we explained, Frye appealed directly to the Supreme Court of North Carolina, which upheld the jury verdicts and his death sentence. Frye then petitioned for review to the Supreme Court of the United States, which denied certiorari on April 1, 1996.

On November 18, 1996, Frye filed his MAR in state court. He was

---

[3]North Carolina law, particularly N.C. Gen. Stat. § 15A-2000 (1999), provides a full list of "aggravating circumstances" and a partial list of "mitigating circumstances" that a jury may consider in deciding whether to recommend a death sentence for a defendant convicted of a capital felony. If the jury finds that one or more aggravating circumstances exist and outweigh mitigating circumstances, it may recommend a death sentence. As explained *infra*, of the fifty-nine mitigating circumstances presented in this case by Frye's lawyers, thirty-four were found by the jury to exist. These thirty-four included, for example:

    38.   That the Defendant is [a] victim of child abuse syndrome.

    44.   The Defendant was whipped repeatedly by his foster father with a bullwhip.

    55.   The Defendant has been a drug abuser since his teens.

J.A. 129-36.

[4]The two aggravating circumstances found by the sentencing jury were: (1) the Childress murder was committed during an aggravated robbery; and (2) it was "especially heinous, atrocious and cruel." *See* Part IV, *infra*.

granted an evidentiary hearing in the Criminal Superior Court of Catawba County (presided over by a judge not previously involved in Frye's case or his appeals). That court conducted a four-day MAR hearing, from October 14-17, 1997, and it denied relief on April 24, 1998. The Supreme Court of North Carolina denied certiorari.

Since Frye filed his MAR in state court within one year of the enactment of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2244(d)(1), the AEDPA statute of limitations was tolled during his state court proceedings. 28 U.S.C. § 2244(d)(2); *Hernandez v. Caldwell*, 225 F.3d 435, 438 (4th Cir. 2000). After his state court remedies were exhausted, Frye timely filed his petition for a federal writ of habeas corpus in the district court. The district court granted the State's motion for summary judgment and dismissed the petition. Frye now seeks to appeal. We review de novo the district court's grant of summary judgment. *Becton v. Barnett*, 920 F.2d 1190, 1192 (4th Cir. 1990).

## II.

### A.

Frye has raised two constitutional questions in this proceeding. Frye initially contends that he was denied his right to the effective assistance of counsel because his lawyers failed to competently prepare for the sentencing phase of his trial. Frye alleges two different bases for the ineffective assistance of his counsel. First, he asserts that his lawyers were constitutionally ineffective in not presenting the jury with supplemental witnesses and other evidence to verify and explain Frye's troubled past. Specifically, Frye maintains that additional non-family witnesses and certain documentary evidence would have provided crucial support of the mitigating circumstances presented to the jury by Dr. Noble. Perhaps more importantly, this evidence may have facilitated the jury's belief in the story of Frye's childhood, as related to the jury through Dr. Noble. Second, Frye maintains that his representation in the trial's sentencing phase was compromised by an asserted alcohol dependency on the part of Mr. Portwood. According to the district court, Portwood consumed approximately twelve ounces of liquor each evening during the course of the trial, but was

never intoxicated prior to or during each day's proceedings. *Frye*, 89 F. Supp. 2d at 701.

Frye also contends that constitutional error is found in the sentencing court's jury instructions regarding the "heinous, atrocious, or cruel" aggravating circumstance of the Childress murder. These terms may be, without an appropriate limiting instruction, unconstitutionally vague. *Maynard v. Cartwright*, 486 U.S. 356, 363-64 (1988). Although the instruction in this case was accompanied by a narrowing provision, Frye argues that the limiting language does not meet the standards required by *Maynard* and *Godfrey v. Georgia*, 446 U.S. 420 (1980).[5] Thus, Frye contends that this instruction, as given, did not provide adequate guidance to the jury in limiting the circumstances in which a death sentence is warranted.

## B.

As pointed out above, both of the constitutional claims asserted by Frye have been adjudicated on their merits by the North Carolina state courts. Accordingly, we review his 28 U.S.C. § 2254(d) petition under the standards recently enunciated by the Supreme Court in *Williams v. Taylor*, 529 U.S. 362, 120 S. Ct. 1495 (2000). Under § 2254, as interpreted by *Williams*, we are precluded from granting habeas corpus relief unless we find the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." *Id*. at 1518. Thus Frye can only secure relief by demonstrating: (1) the state court decision was contrary to, or an unreasonable application of, federal law that (2) was clearly established.

At the threshold, we must consider whether Frye's claims are premised on "clearly established Federal law." The first claim in

---

[5]The limiting provision of the challenged instruction in this case provides as follows:

> For this murder to have been especially heinous[,] atrocious or cruel, any brutality which was involved in it must have exceeded that [which] is normally present in any killing. Or this murder must have been a [conscienceless] or pitiless crime which was unnecessarily torturous to the victim.

Frye's petition — ineffective counsel — is certainly based on clearly established law, notably *Strickland v. Washington*, 466 U.S. 668 (1984). In *Strickland*, the Supreme Court held that, for a conviction to be invalidated because of ineffective assistance, the defendant must show that "particular errors of counsel were unreasonable [and that those errors] actually had an adverse effect on the defense." *Id*. at 693. *Williams* involved facts somewhat similar to those here, i.e., failure to present mitigation evidence. In *Williams*, the petitioner argued that his claim was premised on *Strickland*, and it thus satisfied the requirement of being based on clearly established federal law. The Supreme Court agreed, observing that the question of whether the petition fell under clearly established law was "easily answered." *Williams*, 120 S. Ct. at 1511. This observation applies to Frye's ineffective assistance claim as well.

Frye's second claim — the unconstitutional instruction — is based on the Supreme Court's decision in *Shell v. Mississippi*, 498 U.S. 1 (1990), and on a line of related authorities. Although the challenged instruction in Frye's case is similar to the one held to be unconstitutional in *Shell*, the instruction under challenge here contained a limiting provision that, the State argues, cures the *Shell* problem. While we must determine whether the State's position has validity, this second claim of Frye's petition is also governed by clearly established law enunciated by the Supreme Court.

Our conclusion that Frye's claims are premised on clearly established federal law, however, merely allows us to continue our inquiry. Even though Frye's petition is properly premised on errors of clearly established federal law, we may not grant habeas corpus relief merely because we conclude "that the relevant state-court decision applied [such law] erroneously or incorrectly." Rather, the state court's "application must also be *unreasonable*" in order for us to grant the writ.[6] *Williams*, 120 S. Ct. at 1522 (emphasis added). We are cognizant of, and we are bound to apply, the *Williams* reasonableness standard as we analyze and consider the claims made in this proceeding.

---

[6]On the interpretation of the crucial word "unreasonable," the Court counseled that "the most important point is that an unreasonable application of federal law is different from an incorrect application of federal law." *Williams*, 120 S. Ct. at 1522.

III.

A.

1.

Frye asserts that his counsel was constitutionally ineffective for failing to adequately investigate and present mitigating evidence to the jury. His claim is primarily based on his assertion that the holding in *Williams*, *supra*, is controlling in his case. In *Williams*, the Court held defense counsel's performance deficient for failing to adequately prepare for the sentencing phase of a murder trial. We, however, are able to identify controlling factual distinctions that doom Frye's claims. In *Williams*, for example, preparations were not even begun until a week before trial. And when counsel finally prepared the defense, they purposely ignored evidence of the "petitioner's nightmarish childhood, not because of any strategic calculation, but because they incorrectly thought state law barred access to such records[.]" *Williams*, 120 S. Ct. at 1514.

Another important factor distinguishing this case is that Frye adamantly refused to permit his lawyers to contact his family members or to engage their services in securing mitigation evidence. In *Williams*, the prisoner's counsel failed to gather the required evidence because of professional negligence, while in this situation Frye personally stymied his lawyers' efforts. As the Supreme Court concluded in *Strickland*, "when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable." *Strickland*, 466 U.S. at 691.

Based on Frye's refusal to allow himself or his family members to participate in the development or presentation of mitigation evidence, Frye's counsel came to the reasonable conclusion that attempting to find such evidence would be fruitless. Simply because a defendant objects to the development of evidence, however, does not necessarily absolve his lawyers from gathering that evidence. The Sixth Circuit, in a situation involving failure to present adequate mitigation evidence, observed that "reluctance on [the defendant's] part to present a mental health defense or to testify should not preclude counsel's

investigation of those potential factors." *Carter v. Bell*, 218 F.3d 581, 596 (6th Cir. 2000). Similarly, the Eleventh Circuit has found error when defendant's counsel "acquiesced in [the defendant's] defeatism without knowing what evidence [the defendant] was foregoing." *Blanco v. Singletary*, 943 F.2d 1477, 1501 (11th Cir. 1991). *See also Emerson v. Gramley*, 91 F.3d 898, 908 (7th Cir. 1996).[7]

2.

The controlling distinction in this case, however, is that Frye not only flatly forbade his attorneys from involving his family in investigating his background, but that his defense counsel also took numerous alternative steps to prepare for and present evidence of Frye's personal history. Unlike the cases arising from the Sixth and Eleventh Circuits, *supra*, this is not a situation where counsel completely gave up in response to reluctance or defeatism that ambiguously telegraphed the client's uninformed wishes. Frye gave repeated and explicit instructions to his lawyers about not contacting or involving family members. Nonetheless, counsel convinced him to go to Dorothea Dix Hospital for a psychological evaluation.[8] They then hired Dr. Noble to examine their client and present evidence to the sentencing

---

[7]Furthermore, the American Bar Association's guidelines for defense counsel in death penalty cases provide that "investigation for preparation of the sentencing phase should be conducted regardless of any initial assertion by the client that mitigation is not to be offered." American Bar Association, *Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases* § 11.4.1.c (1989). While practice advisories such as those published by the ABA are "guides to determining what is reasonable," they cannot always "take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." *Strickland*, 366 U.S. at 688.

[8]Frye now argues that his position changed after the Dix report was prepared, and that counsel then had a duty to investigate notwithstanding his earlier instructions. The problem with this argument, raised in Frye's reply brief, is that it is contradicted by the facts reasonably found by the state court. *MAR Hearing* at 6 ("The defendant *maintained his position* that he did not want his family members . . . to assist in forming mitigating factors *throughout the trial up to and including the sentencing phase*.") (emphasis added).

jury. These steps were a logical — and indeed thorough — response
to Frye's continued insistence that he did not want his family mem-
bers "to assist in forming mitigating factors[.]" *MAR Hearing* at 6. As
the MAR court concluded, defense counsel painstakingly informed
Frye of the consequences of not involving family members in the mit-
igation stage. *Id.* Frye, however, refused to accede to the warnings
and advice of his lawyers. And it is not our role to second-guess the
competence of counsel in these circumstances. *Fisher v. Lee*, 215
F.3d 438, 447 (4th Cir. 2000); *Eaton v. Angelone*, 139 F.3d 990, 994
(4th Cir. 1998).

This is simply not a case involving professional negligence or lack
of attention on the part of counsel. We instead perceive this to be a
situation where two court-appointed lawyers endeavored to do their
best, under difficult circumstances interposed by their client. Frye's
counsel, as a result of their investigation, knew that Frye had suffered
from serious child abuse and neglect, and they introduced evidence
in that connection — in the most effective way possible under the cir-
cumstances. However, Frye now claims that the method of introduc-
ing the evidence — through Dr. Noble — was constitutionally
inadequate, in part because Dr. Noble was not presented with suffi-
cient background information about Frye. In this regard, Frye relies
on our decision in *McCarver v. Lee*, 221 F.3d 583, 595 (4th Cir.
2000), where we concluded that "it is sound and reasonable trial strat-
egy to provide all available information" to an expert psychological
witness.

Frye's reliance on *McCarver*, however, is misplaced, and he over-
states its relevance in this instance. While it may be "reasonable" to
provide an expert witness with all available information, we did not
hold in *McCarver* that it is *per se* "unreasonable" to fail to provide
the expert with such information. Importantly, Frye's attorneys sim-
ply did not possess all the relevant information, and they were not
privy to it, because of their client's steadfast refusal to allow them to
complete a full investigation.[9] Significantly, however, counsel pro-

---

[9]Frye asserts additional authority that, as a general proposition, it con-
stitutes ineffective assistance not to provide expert psychological wit-
nesses with background material. *See Wallace v. Stewart*, 184 F.3d 1112
(9th Cir. 1999); *Hendricks v. Calderon*, 70 F.3d 1032 (9th Cir. 1995).
These decisions are inapposite, inasmuch as they do not involve situa-
tions where the defendant insisted that his family members not be
involved in "forming mitigating factors."

vided Dr. Noble with a "stack" of documents from Dorothea Dix Hospital, which was all the "available information" they were able to provide while honoring their client's explicit instructions.

Dr. Noble testified at the MAR hearing that his work in preparing for trial was constrained by the lack of time and paucity of background material, and that he was unable to testify as convincingly as he otherwise might have. However, he gave no indication, either at trial or at the MAR hearing, that he had been unable to render a competent opinion. Indeed, at the MAR hearing, he testified that supplementary materials concerning Frye's background (which Frye's trial counsel did not uncover and therefore did not present to Dr. Noble before his testimony) had "not really altered [his] diagnosis[.]" J.A. 418.

The purpose of Frye's pretrial meeting with Dr. Noble was to develop additional evidence and history, which Frye was unwilling to allow his lawyers to uncover by way of interviews with his family. Frye only agreed to meet with Dr. Noble on the insistence of his counsel, which led to a compromise — between Frye and his lawyers — that Frye would accept expert testimony as an alternative way of presenting mitigating evidence. In these circumstances, any diminution in the effectiveness of Dr. Noble's testimony did not result from his counsel's lack of competence, but emanated directly from Frye's refusal to follow their advice.

Notwithstanding the complications hindering its development, Dr. Noble's testimony was effective, as demonstrated by the jury's acceptance of thirty-four of the fifty-nine mitigating circumstances. Whether Dr. Noble could have been more effective if corroborated by other evidence is speculative. We must, under the law, judge the reasonableness of the lawyers' conduct as of the time their actions occurred, not the conduct's consequences after the fact. *Strickland*, 466 U.S. at 689 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."); *see also Bunch v. Thompson*, 949 F.2d 1354, 1363 (4th Cir. 1991) ("When examining ineffective assistance claims, however, we must appreciate the practical limitations and tactical decisions that

trial counsel faced."). In this situation, the presentation of mitigation evidence through Dr. Noble was a reasonable solution to the dilemma faced by Frye's lawyers.

3.

In our analysis of the ineffective assistance claim alleged by Frye, we are mindful that in North Carolina — as in most jurisdictions — the client must be permitted by his lawyers to control his own defense, as long as he is "fully informed" in making his decisions. *See State v. White*, 508 S.E.2d 253, 273 (N.C. 1998), *cert. denied*, 527 U.S. 1026 (1999); *State v. Wilkinson*, 474 S.E.2d 375, 382 (N.C. 1996) ("The attorney is bound to comply with her client's lawful instructions, 'and her actions are restricted to the scope of the authority conferred.'") (quoting *People v. Wilkerson*, 463 N.E.2d 139, 143-44 (Ill. App. Ct. 1984)); *State v. Ali*, 407 S.E.2d 183, 189 (N.C. 1991).

Frye's attorneys took reasonable steps to comply with their professional responsibilities in this regard. Frye's decision not to allow his family to aid in mitigation was unchanged after repeated discussions where his lawyers explained their displeasure with his position, and the consequences thereof. The MAR court specifically found that:

> Mr. Portwood engaged in several conferences with the defendant wherein he sought to convince the defendant to permit the defense to produce mitigating evidence. Also, Mr. Portwood tried to convince the defendant to permit family members to testify.

*MAR Hearing* at 6. There is simply no basis for us to conclude that this finding of fact is unreasonable. *Williams*, 120 S. Ct. at 1522. Indeed, this finding is fully supported in the record, and it is uncontroverted. Were we to hold that Portwood and Cummings rendered ineffective assistance, despite their repeated attempts to have Frye change his mind on presenting mitigation evidence, we would be forcing defense lawyers in future cases to choose between Scylla and Charybdis.[10] If the lawyer facing a reluctant client accedes to the client's

---

[10]In Homer's *Odyssey*, Odysseus is presented with a most difficult choice: he must sail through straits that are bracketed by two monsters,

requests, he might be constitutionally ineffective. On the other hand, if the lawyer defies his client's wishes, and in so doing presents evidence that harms the client, he might render ineffective assistance and commit malpractice as well.

## B.

Frye also contends, in connection with his ineffective assistance claim, that Portwood's asserted alcohol dependency rendered him incapable of providing constitutionally effective assistance up to and during the sentencing phase of the trial. We are indeed troubled by Portwood's acknowledgment of a decades-long routine of drinking approximately twelve ounces of rum each evening. However, the district court found that Portwood "never consumed alcohol during the work day and never performed any work on the case when he had consumed alcohol." *Frye*, 89 F. Supp. 2d at 701. We agree with our sister circuits that, in order for an attorney's alcohol addiction to make his assistance constitutionally ineffective, there must be specific instances of deficient performance attributable to alcohol. *See Bonin v. Calderon*, 59 F.3d 815, 838 (9th Cir. 1995); *Cabarello v. Keane*, 42 F.3d 738, 740 (2d Cir. 1994); *Berry v. King*, 765 F.2d 451, 454 (5th Cir. 1985); *Young v. Zant*, 727 F.2d 1489, 1492-93 (11th Cir. 1984). In this case, there is no evidence of specific instances of defective performance caused by Portwood's alcohol abuse.[11] Furthermore, it is significant that Frye was not represented by Portwood alone — he had the benefit of two court-appointed lawyers assisting in his defense. And no attack is made on the professional capacity of Mr. Cummings. *See Lopez-Nieves v. United States*, 917 F.2d 645, 647 (1st Cir. 1990) ("[T]he presence of a second attorney during the proceed-

---

and he must choose a course which leads closer to one or the other. One choice, Scylla, is a six-headed creature who is certain to eat six of his crewman, while the other, Charybdis, spews forth a whirlpool that poses an uncertain risk to the entire ship and crew. Odysseus, following the advice of the sorceress Circe, chose Scylla, and six of his men perished.

[11]Indeed, with respect to Portwood's alcohol dependency, Cummings testified at the MAR hearing that he "never saw Mr. Portwood's professional demeanor or behavior affected by the consumption of alcohol" and that he was a "diligent, hard-working lawyer working for the defendant[.]" J.A. 742.

ings seriously undermines appellant's claim of ineffective assistance of counsel.").

## C.

Under the *Strickland* standard, the performance of Frye's lawyers was simply not deficient, and the sentencing phase defense was conducted reasonably. Moreover, Frye is unable to point to a single instance where Portwood's consumption of alcohol affected his performance. We have carefully considered all of Frye's contentions in this regard, and we are unable to conclude that the legal assistance he received was constitutionally defective.[12]

## IV.

Frye also claims that the jury instruction relating to a statutory aggravating circumstance was unconstitutionally vague and overbroad. This instruction was given with respect to the jury's determination of whether the prosecution had established the aggravating circumstance that the Childress murder was "heinous, atrocious, or cruel" under N.C. Gen. Stat. § 15A-2000(e)(9) (1999).[13]

---

[12]Having concluded that the performance of Frye's counsel was not deficient, we need not decide whether Frye was prejudiced by the errors he alleged. *Strickland*, 466 U.S. at 697 ("[T]here is no reason for a court deciding an ineffective assistance claim to . . . address both components of the inquiry if the defendant makes an insufficient showing on one."). *See also Chandler v. United States*, 218 F.3d 1305, n.44 (11th Cir. 2000); *LaGrand v. Stewart*, 133 F.3d 1253, 1270 (9th Cir. 1998).

[13]The entirety of the sentencing instruction on the aggravating circumstance of "heinous, atrocious, or cruel," embodied in § 15A-2000(e)(9), was as follows:

> Aggravating factor number two. Was this murder especially heinous[,] atrocious or cruel? In this context heinous means extremely wicked or shockingly evil. Atrocious means outrageously wicked and vile. And cruel means designed to inflict a high degree of pain with utter indifference to and even enjoyment of the suffering of others. However, it is not enough that this murder be heinous[,] atrocious or cruel as these terms have just been defined. This murder must have been especially heinous, atrocious or cruel, and not every murder is especially so.

As we have pointed out, the first paragraph of the challenged instruction bears similarities to the instruction found to be unconstitutional in *Maynard*, 486 U.S. at 363-64. The *Maynard* instruction, like this one, was given pursuant to state law which permitted imposition of a death sentence if the murder was "especially heinous, atrocious, or cruel." In *Maynard*, the Court held the instruction overly vague, and therefore unconstitutional, because it provided no meaningful basis to distinguish a murder warranting the death penalty from those in which the ultimate punishment should not be imposed. 486 U.S. at 363-64. *See also Godfrey*, 446 U.S. at 428-29.

Likewise, we have previously held a North Carolina instruction on the statutory aggravating circumstance of "especially heinous, atrocious, or cruel" to be, standing alone, unconstitutionally vague. *Smith v. Dixon*, 14 F.3d 956, 974 (4th Cir. 1994) (en banc). There is, however, a controlling distinction here — the instruction given to Frye's jury did not stand alone. A statutory aggravating circumstance that is otherwise vague may be constitutional if it is accompanied by an appropriate limiting provision providing sufficient guidance to the jury. *Fisher v. Lee*, 215 F.3d at 457-58. Indeed, the Supreme Court of North Carolina, in Frye's direct appeal, held that the limiting explanation in this case — defining the level of brutality or torture to the victim — provided sufficient guidance to the jury. *Frye*, 461 S.E.2d at 685. We are unable to disturb the state court's finding in this regard, since it was not contrary to, or an unreasonable application of, governing Supreme Court precedent.

## V.

We find no reason to upset the carefully considered judgments of the courts that have considered Frye's petitions for post-conviction

---

For this murder to have been especially heinous[,] atrocious or cruel, any brutality which was involved in it must have exceeded that [which] is normally present in any killing. Or this murder must have been a [conscienceless] or pitiless crime which was unnecessarily torturous to the victim.

J.A. 97-98.

relief. Neither the MAR court's conclusion that Frye's lawyers were not constitutionally ineffective, nor the Supreme Court of North Carolina's conclusion that the sentencing instruction was not unconstitutionally vague, constitutes an unreasonable application of governing legal principles enunciated by the Supreme Court of the United States. The district court therefore properly granted summary judgment to the State. We must decline to issue Frye a certificate of appealability, and we dismiss his appeal.

*CERTIFICATE OF APPEALABILITY*
*DENIED AND APPEAL DISMISSED*