**UNPUBLISHED**

**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 08-12

CERRON THOMAS HOOKS,

Petitioner - Appellant,

v.

GERALD J. BRANKER, Warden, Central Prison, Raleigh, North
Carolina,

Respondent - Appellee.

Appeal from the United States District Court for the Middle
District of North Carolina, at Durham.  James A. Beaty, Jr.,
Chief District Judge.  (1:05-cv-01127-JAB-PTS)

Argued:  September 25, 2009          Decided:  October 23, 2009

Before NIEMEYER, MICHAEL, and KING, Circuit Judges.

Affirmed by unpublished opinion.  Judge Niemeyer wrote the
opinion, in which Judge Michael and Judge King joined.

**ARGUED:** Marilyn G. Ozer, MASSENGALE & OZER, Chapel Hill, North
Carolina, for Appellant.  Jonathan Porter Babb, Sr., NORTH
CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for
Appellee.  **ON BRIEF:** William F. W. Massengale, MASSENGALE &
OZER, Chapel Hill, North Carolina, for Appellant.  Roy Cooper,
Attorney General of North Carolina, Raleigh, North Carolina, for
Appellee.

Unpublished opinions are not binding precedent in this circuit.

NIEMEYER, Circuit Judge:

Challenging his death sentence for first-degree murder, imposed in North Carolina state court, Cerron Hooks filed this habeas corpus petition in federal court under 28 U.S.C. § 2254.

During a quarrel at a pool party in Winston-Salem, North Carolina on September 5, 1998, Hooks shot and killed Mike Miller. Lisa McRae and Sabrina Porter, attendees at the party, testified that after Hooks shot Miller, Hooks kicked him in the face and taunted him before fleeing the scene. The state court jury convicted Hooks of first-degree murder and, finding that the crime was "especially heinous, atrocious, or cruel," N.C. Gen. Stat. § 15A-2000(e)(9), recommended that he be sentenced to death. The state court imposed the death penalty, and, on direct appeal, the Supreme Court of North Carolina affirmed. State v. Hooks, 548 S.E.2d 501 (N.C. 2001). The U.S. Supreme Court denied Hooks' petition for a writ of certiorari. Hooks v. North Carolina, 534 U.S. 1155 (2002).

Hooks later filed a motion for appropriate relief in state court -- the North Carolina mechanism for post-conviction relief -- claiming, among other things, that a newly available affidavit from Lisa McRae rendered him ineligible for the death penalty. He also asserted that his trial counsel was ineffective for failing adequately to cross-examine McRae and

2

Porter.  The court denied Hooks' motion, and the North Carolina Supreme Court denied certiorari.

Having exhausted his state remedies, Hooks filed this petition for a writ of habeas corpus, which the district court denied.  We issued a certificate of appealability with respect to three issues, and on those three issues we now affirm, finding that the North Carolina courts made no decision that was contrary to, or an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court.  See 28 U.S.C. § 2254(d)(1).

I

On the evening of September 5, 1998, Mike Miller hosted a party at the pool of his apartment complex, and Cerron Hooks attended, having been invited by a mutual friend.  Around 9:30 p.m., Miller invited guests back to his second-floor apartment to continue the party, and Hooks was also among those attending at the apartment.

After he left the party, Hooks returned to look for a shirt he had taken off earlier.  Miller told him that he had not seen the shirt but would look for it and return it to a mutual friend if he found it.  Hooks departed but again returned to search the apartment himself.  When he attempted to enter Miller's bedroom, Miller prevented him from doing so, and a heated argument

3

ensued. Later testimony indicated that tension had also developed between the two over the romantic attentions of Lisa McRae, another attendee of the party. But the argument between Hooks and Miller mainly concerned the shirt.

Miller told Hooks that he could not disrespect his house and that he had to leave. Although Hooks complied, the argument continued outside of the apartment, first on the second-story breezeway and then down the stairway onto the ground floor. As the two argued face to face, Hooks threatened to "f--k [Miller] up." Hooks then pulled out a gun and pointed it at Miller's face, to which Miller responded, "Oh, you're going to shoot me now." After a pause, Hooks shot Miller four times. Miller fell to the ground, gravely wounded but conscious. Hooks then kicked and pistol-whipped Miller in the face, taunting him by saying, "You thought I was playing, you thought I was playing." He then fled the scene. Bystanders administered first aid to Miller, who remained conscious for about 15 minutes. He died 12 hours later at the hospital.

Lisa McRae and Sabrina Porter were interviewed by police officers at the scene, and the officers made cursory notes, but both gave fuller recorded statements to the police on the following day, September 6, 1998. In her recorded statement, McRae stated that she witnessed the shooting from nearby on the ground floor and saw Hooks kick Miller and taunt him, saying,

4

"You thought I was playing; you thought I was playing." In her recorded statement, Porter stated that she did not actually see the shooting, but she heard the gunshots from Miller's apartment and went out to look over the balcony at the scene below. She stated that she saw Hooks kick and pistol-whip Miller. The cursory handwritten notes of police officers written at the scene did not contain any references to Hooks' kicking, pistol-whipping, or taunting Miller.

Later, at the pretrial hearing, McRae and Porter made statements substantially similar to those that they had given to police in their recorded statements.

At trial, McRae's testimony was again substantially similar to her previous statements given to the police and at the preliminary hearing. She testified that she witnessed the shooting and that after Miller fell, Hooks kicked him in the face and said, "You thought I was playing." Defense counsel cross-examined her as to why her initial statement to the police on September 5 did not mention anything about kicking or taunting, but McRae insisted, "Well, that's what he did. . . . I saw the kicking."

Porter's trial testimony was likewise consistent. She testified that she had heard the shots but did not see the shooting and that afterwards she saw the kicking, pistol-whipping, and taunts from the second floor balcony. Defense

5

counsel did not cross-examine Porter about whether she told police about the kicking, pistol-whipping, and taunting on the evening of the shooting or why references to that were not contained in the police officer's notes.

At trial, three other witnesses testified to seeing the shooting but made no statements about any kicking, pistol-whipping, or taunting.

The medical examiner testified at trial that Miller had died approximately 12 hours after the shooting as a result of gunshot wounds. On cross-examination, he stated that there was no evidence of bruising or swelling on Miller's face or scalp. The examiner stated that given the amount of time that elapsed between the shooting and Miller's death, bruising or swelling likely would have appeared if Miller had sustained a blunt force trauma, such as kicking or pistol-whipping.

The jury found Hooks guilty of first-degree murder, and in view of the evidence presented at trial, the judge permitted the jury to decide whether Hooks' crime was "especially heinous, atrocious, or cruel" as to justify the death penalty under North Carolina law. The trial judge also submitted for the jury's decision a number of possible mitigating circumstances. On the aggravating circumstance issue, the judge instructed the jury:

> Under the evidence in this case, there is one possible
> aggravating circumstance which may be considered. .

. . Was this murder especially heinous, atrocious or cruel?

Now in this context, heinous means extremely wicked or shockingly evil. Atrocious means outrageously wicked and vile; and cruel means designed to inflict a high degree of pain with utter indifference to, or even enjoyment of, the suffering of others.

However, it is not enough that this murder be heinous, atrocious or cruel, as these terms have just been defined. This murder must have been especially heinous, atrocious or cruel and not every murder is especially so.

For this murder to have been especially heinous, atrocious or cruel, any brutality which was involved in it must have exceeded that which is normally present in any killing, or this murder must have been a conscienceless or pitiless crime which was unnecessarily torturous to the victim.

The jury found unanimously that this aggravating circumstance was present and was not outweighed by any mitigating factors. It accordingly recommended that Hooks be sentenced to death, and the trial judge imposed the death penalty.

The North Carolina Supreme Court affirmed the conviction and sentence, rejecting Hooks' challenges, which included claims that the aggravating factor was unconstitutionally vague and that Hooks' death sentence was disproportionate relative to other cases in which capital punishment was not imposed in North Carolina. See Hooks, 548 S.E.2d 501, 511-13 (N.C. 2001).

In his motion for appropriate relief challenging his conviction and sentence, Hooks raised a number of claims, including two that are presented here. First, Hooks argued that

7

a recent affidavit from McRae, which he attached to his motion for appropriate relief, constituted newly discovered evidence that rendered him ineligible for the death penalty. In the affidavit, McRae stated the following about the events on September 5, 1998:

> I followed Mike [Miller] out into the breezeway and was a witness to the shooting. The shooting happened very much as I testified at trial. After Mr. Hooks shot Mike, he put his foot in Mike's face; I cannot be certain whether he kicked him or not.

In the affidavit, McRae also conceded that she had been drinking alcoholic beverages during the party, but was "not impaired and the alcohol did not affect my ability to recall events of the day." This testimony was contrary to her trial testimony, in which she denied having been drinking at the party.

Also in his motion for appropriate relief, Hooks argued that his trial counsel was ineffective for failure to cross-examine and impeach McRae and Porter about certain purported discrepancies in their testimony. The state court rejected each of Hooks' claims, and the North Carolina Supreme Court denied certiorari.

Hooks then filed his petition for a writ of habeas corpus in federal court, claiming 11 grounds for relief -- all of which the district court rejected. Hooks sought to appeal three of his claims, and with respect to those, we granted a certificate of appealability.

8

Hooks contends first that the new McRae affidavit, stating that she was uncertain whether she saw Hooks kick Miller after shooting him, amounts to a recantation that renders him innocent of the death penalty. In support of his argument, he cites Sawyer v. Whitley, 505 U.S. 333 (1992), for the proposition that newly discovered evidence can render a habeas petitioner innocent of the death penalty. He reasons that the trial judge was willing to submit the "especially heinous, atrocious, or cruel" aggravating factor to the jury only because of the evidence of kicking and taunting, and when evidence that he did not kick and taunt Miller is presented, it renders him ineligible for capital punishment. He maintains that McRae's affidavit, when combined with the medical examiner's testimony regarding the lack of swelling or bruising, casts substantial doubt not only on McRae's trial testimony, but also on Porter's similar testimony.

As the state court considered and rejected Hooks' claim, denying his motion for appropriate relief, we now consider the claim under the deferential standard stated in 28 U.S.C. § 2254(d)(1) to determine only whether the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."

We conclude that Hooks' claim fails as a matter of both law and fact. First, the decisions in Sawyer and the similar cases cited by Hooks are inapposite. Those cases stand for the proposition that a defendant may, by a showing of actual innocence, excuse the procedural barriers of a successive, abusive, or defaulted habeas claim in order to reach the merits of a constitutional claim. In Sawyer, the defendant's new evidence of innocence was presented to allow the court to consider a defaulted and therefore unavailable constitutional claim. See, e.g., Sawyer, 505 U.S. at 336 ("[T]o show 'actual innocence' one must show by clear and convincing evidence that, but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under the applicable state law") (emphasis added). But Hooks does not advance evidence of innocence to reach a defaulted constitutional claim. He seeks simply to assert, by new evidence, that he is innocent.

Beyond Sawyer, Hooks provides no support for a claim of actual innocence independent of any constitutional violation, and the Supreme Court has never recognized such a claim as a meritorious ground for habeas corpus. The Court has suggested that such a claim could be made, but the showing required "would necessarily be extraordinarily high." Herrera v. Collins, 506 U.S. 390, 417 (1993). Neither the Supreme Court nor this court

10

has ever found facts sufficiently compelling to grant the writ for a claim of innocence without the claim of an underlying constitutional violation. See Buckner v. Polk, 453 F.3d 195, 199 (4th Cir. 2006) ("[C]laims of actual innocence are not grounds for habeas relief even in a capital case") (quoting Rouse v. Lee, 339 F.3d 238, 255 (4th Cir. 2003) (en banc) (citing Herrera, 506 U.S. at 405)).

In this case, McRae's purported recantation falls well short of meeting the "extraordinarily high" showing needed to raise a colorable freestanding innocence claim. Hooks argues that because McRae omitted facts indicating that she lied at trial when she testified that she had not been drinking and because she was willing to recharacterize her kicking testimony, her trial testimony could be found to be incredible. When taken on its face, however, the affidavit does not amount to a recantation. It expresses some reservation about how to characterize what happened, but the affidavit states, "The shooting happened very much as I testified at trial." (Emphasis added). It then recharacterizes the kicking as putting a foot in the victim's face: "After Mr. Hooks shot Mike, he put his foot in Mike's face; I cannot be certain whether he kicked him or not." McRae does not explain whether Hooks' putting his foot in Miller's face is materially different from kicking his face. Regardless of the obvious difference, however, McRae's

11

testimony, even with the affidavit, remains that Hooks' foot engaged Miller's face while he was on the ground and that Hooks taunted him. But more importantly, McRae's affidavit does nothing to disturb Porter's trial testimony that she witnessed kicking.

Hooks' challenge amounts to an attempt to use the McRae affidavit as an invitation to relitigate the facts of his case. But that is not our role on habeas review. See 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence"). We conclude that McRae's affidavit does not carry Hooks' heavy burden.

Finally, Hooks calls our attention to the Supreme Court's recent order in In re Davis, __ S. Ct. __, 2009 WL 2486475 (2009) (mem.). Davis, however, has no bearing on the proper disposition of this case. In Davis, the Supreme Court took the extraordinary step of ordering a district court to hold an evidentiary hearing for a determination of whether a petitioner had made a showing that clearly established his innocence of the crime for which he was convicted by demonstrating that seven of the State's witnesses against Davis recanted their trial

12

testimony, and several implicated the State's principal witness as the shooter. See id. at *1 (Stevens, J., concurring). Hooks' showing in this case pales in comparison.

In short, we conclude that Hooks has failed to satisfy the burdens imposed on him by 28 U.S.C. §§ 2254(d)(1) and 2254(e)(1).

III

Hooks next contends that his trial counsel was constitutionally ineffective for failing to cross-examine McRae and Porter on specific matters. He notes that because McRae and Porter were the only two witnesses to testify about Hooks kicking and taunting Miller, their testimony provided the only basis for the death penalty. Consequently, he argues, effective impeachment of McRae and Porter would have prevented his death sentence. The state court considered this ineffectiveness claim on Hooks' post-conviction motion and rejected it, finding that counsel's trial conduct was not deficient and that, in any event, Hooks was not prejudiced.

To prevail on a claim of ineffective assistance of counsel, Hooks must satisfy the two prong test in Strickland v. Washington, 466 U.S. 668 (1984). First, he must demonstrate that his counsel performed below an objective standard of reasonableness. Id. at 687-89. Second, he must show that this

13

poor performance prejudiced him. Id. at 687. Prejudice is a reasonable probability that but for counsel's errors, the result of the proceeding would have been different -- here, that the jury would not have found Hooks eligible for the death penalty. Id. at 694-95.

Hooks focuses first on the inconsistency between the statement that McRae gave to police officers at the scene on September 5 and the statement that she gave to police the next day on September 6 -- that she apparently denied on September 5 seeing the shooting and that in every statement thereafter she claimed that she witnessed the shooting.

Counsel did indeed fail to question McRae about this apparent discrepancy. The September 5 statement, however, was recorded by the police officer at the scene in three handwritten sentences. The very next day, McRae gave a full recorded statement in which she stated that she had witnessed the shooting. Moreover, she maintained this position thereafter, including in her recently submitted affidavit on which Hooks has heavily relied, where she stated that she "was a witness to the shooting." Cross-examination on this discrepancy would not have changed the fact that Hooks shot Miller, an essentially uncontested fact. Cross-examination would only have produced speculation to bridge the apparent inconsistency, such as the officer did not hear correctly or he transcribed what he heard

14

incorrectly.  But little else could have been obtained by cross-examination because McRae described the shooting in terms similar to every other eyewitness, and cross-examination would not likely have been fruitful.  Certainly the outcome of the trial would not have been changed.

Hooks also faults trial counsel for failing to impeach McRae with the fact that her initial statement on September 5 did not mention kicking, and her full recorded statement given the next day did.  This claim, however, is meritless because counsel <u>did</u> in fact impeach McRae with this inconsistency and did so repeatedly.  For example:

> Q.   You said in your testimony on direct that Cerron, after he shot him, kicked him and stomped on his face?
>
> A.   Yes.
>
> Q.   You gave a statement to the officers and didn't say anything about stomping on his face.  Is that something you remembered since you gave that statement?
>
> A.   Yes.
>
> Q.   And you gave a statement to Detective Spillman as well and you didn't say anything about it then?
>
> A.   Well, that's what he did.
>
> Q.   Who saw the kicking?
>
> A.   Whatcha you mean?  I saw the kicking.
>
>                  *     *     *
>
> Q.   Who else would have been in a position to see the kicking?

15

A.    I'm not sure cause after Mike had got shot, to me
      everybody was gone.  I didn't see nobody.

Q.    So you were the only one that saw it?

A.    As far as I know of.

Hooks also faults his trial counsel for failing to impeach Porter with the fact that her initial statement given on September 5 at the scene of the murder made no mention of kicking, pistol-whipping, or taunting, even though the full recorded statement that she gave the next day did.  But the discrepancy can hardly be momentous or material in view of the fact that the police officer taking notes at the scene devoted only one sentence to his interview of Porter:  "A Sabrina Porter only heard the shots and ran to give first aid to the victim."  This single statement, which is the full report of her statement on September 5, was not inconsistent with what Porter maintained thereafter; it simply did not contain any further details.  Beginning with her full, recorded statement on September 6, Porter consistently stated that she saw kicking and pistol-whipping.  Cross-examining her about her statements might only have emphasized the consistency of her account and probably would not have made her back down from that detail.  We can hardly conclude that the failure to attempt to exploit this discrepancy, with its potential for mixed results, was deficient or would have made a difference.

16

Hooks also contends that his counsel was ineffective for failing to question Porter about the fact that shortly after the shooting, she did not see Kenneth Hoskins, an attendee at the party, fall over the second-floor railing and land near the scene. Testimony was presented that Hoskins was descending the stairs when he heard the shots. In an apparent panic, he fled back up the stairs and fell over the railing. In her full statement on September 6, Porter acknowledged that others had said that Hoskins had fallen over the railing, but stated that she did not see it. Hooks argues now that Porter's failure to notice this remarkable detail could well have been advanced to cast doubt on the credibility of her other testimony. But again, this is merely speculation. There may have been plausible reasons why Porter did not see Hoskins. For instance, she may not have left the apartment in time to see him fall, or she may have been focusing entirely on Miller, while giving him aid. Failure to ask Porter about Hoskins' fall is not the sort of deficiency that has been recognized as ineffective assistance of counsel. More importantly, no prejudice could have occurred because there was not a "reasonable probability" that the outcome of the trial would have been different had she been cross-examined about not seeing Hoskins fall, especially when she acknowledged others' testimony on the fact.

17

Hooks next claims that his trial counsel was ineffective for failing to impeach McRae and Porter with the medical examiner's testimony that a lack of bruising and swelling was inconsistent with blunt force trauma, such as kicking. The North Carolina Superior Court rightly pointed out, however, that because counsel thoroughly cross-examined the medical examiner about the bruising, cross-examination of McRae and Porter would have been duplicative at best. More likely, because they were lay fact witnesses, they would not have been in a position to comment on or give opinions about the medical examiner's testimony.

Finally, Hooks argues that his trial counsel was ineffective for not confronting McRae and Porter about "what motives they may have had for concocting the new story [about kicking and taunting]" during their time together on September 6 before they gave their recorded statements. Again, this failure was not unreasonable. It is well within the range of reasonable trial strategy to avoid directly accusing adverse witnesses of conspiring to lie and lying, especially when there is no factual basis for the accusation. Additionally, the outcome almost certainly would not have turned on such cross-examination. The witnesses were unlikely to relent in response to such questioning because, as the State points out, McRae and Porter

18

would have had no reason to believe that these details were of any legal significance.

In sum, Hooks has failed to demonstrate that the state court's determination that his trial counsel was effective was contrary to, or an unreasonable application of, Strickland and its progeny.

IV

Finally, Hooks claims that North Carolina's "especially heinous, atrocious, or cruel" aggravating factor and the jury instruction that the trial judge gave on it were unconstitutionally vague and failed to limit the jury's discretion. See Maynard v. Cartwright, 486 U.S. 356, 360-63 (1988) (holding that Oklahoma's "especially heinous, atrocious, or cruel" aggravating circumstance was unconstitutionally vague); Godfrey v. Georgia, 446 U.S. 420, 428-29 (1980) (holding that Georgia's "outrageously or wantonly vile, horrible or inhuman" aggravating circumstance was unconstitutionally vague). The North Carolina Supreme Court rejected this claim. Hooks, 548 S.E.2d at 511.

Hooks' argument is directly foreclosed by our precedents, which have concluded that although standing alone this North Carolina aggravating factor might not pass constitutional muster, when given along with the pattern instruction that was

19

given to the jury in this case, the jury's discretion is sufficiently limited. We have held that the jury instruction provides guidance and does not create the boundless discretion condemned in Maynard, Godfrey, and similar cases. See Fullwood v. Lee, 290 F.3d 663, 694 (4th Cir. 2002); Frye v. Lee, 235 F.3d 897, 907-08 (4th Cir. 2001); Fisher v. Lee, 215 F.3d 438, 458-59 (4th Cir. 2000).

Hooks makes a related argument that the killing in this case cannot be deemed "especially heinous, atrocious, or cruel" because the aggravating factor was unconstitutionally applied in this case, inasmuch as the murder Hooks committed was less appalling than the eight others for which the North Carolina Courts sentenced defendants to death during the year he was convicted. Each of the other eight cases involved multiple murders or murders during the course of felonies such as rape or armed robbery. Hooks also argues that compared with other North Carolina cases, his crime is more aptly considered second-degree murder. In short, he invites us to engage in a comparative proportionality review.

Although the North Carolina Supreme Court did engage in such review on direct appeal and rejected Hooks' claim, see Hooks, 548 S.E.2d at 511-13, the United States Supreme Court has held that comparative proportionality review is not required by the Eighth Amendment. See Pulley v. Harris, 465 U.S. 37, 44-51

(1984).  Such a claim is, accordingly, not cognizable on federal habeas review, even as it is without merit.

*    *    *

In sum, the North Carolina courts made no decision that was contrary to, or an unreasonable application of, clearly established federal law as determined by the United States Supreme Court.  28 U.S.C. § 2254(d)(1).  Accordingly, we affirm the judgment of the district court.

AFFIRMED